## Case No. 3,776.

### DE LOVIO v. BOIT et al.[1]

[2 Gall. 398.][2]

Circuit Court, D. Massachusetts. Oct. Term, 1815.

ADMIRALTY JURISDICTION — MARITIME CONTRACTS AND TORTS — MARITIME INSURANCE — JURISDICTION AT LAW—BOTTOMRY BONDS.

1. The admiralty has jurisdiction over all maritime contracts, wheresoever the same may be made or executed, and whatever may be the form of the stipulations.[3] The admiralty has also jurisdiction over all torts and injuries committed upon the high seas, and in ports or harbors within the ebb and flow of the tide. The like causes are within the jurisdiction of the district courts of the United States by virtue of the delegation of authority "in all civil causes of admiralty and maritime jurisdiction."

[Cited in Willard v. Dorr, Case No. 17,679; Jenks v. Lewis, Id. 7,279; Steele v. Thacher, Id. 13,348; American Ins. Co. v. Johnson, Id. 303; Ramsay v. Allegre, 12 Wheat. (25 U. S.) 638; Waterbury v. Myrick, Case No. 17,253; Davis v. The Seneca, Id. 3,650; U. S. v. Grush, Id. 15,268; The Tilton, Id. 14,054; The Wave, Id. 17,297; Borden v. Hiern, Id. 1,655; The Gold Hunter, Id. 5,513; The Perseverance, Id. 11,017; The Volunteer, Id. 16,991; Davis v. New Brig, Id. 3,643; Thackarey v. Farmer of Salem, Id. 13,852; House v. The Lexington, Id. 6,737; U. S. v. Mackenzie, Id. 15,691; Dundas v. Bowler, Id. 4,140; The Martha Anne, Id. 9,146; Mutual Safety Ins. Co. v. The George, Id. 9,981; The Lotty, Id. 8,524; Leland v. The Medora, Id. 8,237; Packard v. The Louisa, Id. 10,652; U. S. v. New Bedford Bridge, Id. 15,867; Van Santwood v. The John B. Cole, Id. 16,875; Lowry v. The E. Benjamin, Id. 8,582; Greeley v. Smith, Id. 5,750; Waring v. Clarke, 5 How. (46 U. S.) 473, 478, 486; New Jersey Steam Nav. Co. v. Merchants' Bank, 6 How. (47 U. S.), 421, 436; Taylor v. The Royal Saxon, Case No. 13,803; Kynoch v. The S. C.

Ives, Id. 7,958; Tunno v. The Betsina, Id. 14,236; Jackson v. The Magnolia, 20 How. (61 U. S.) 335; Marsh v. The Minnie, Case No. 9,117; The Richard Busteed, Id. 11,764; The Clarion, Id. 2,795; The Sarah Jane, Id. 12,349; Jackson v. The Kinnie, Id. 7,137; Francis v. The Harrison, Id. 5,038; Moir v. The Dubuque, Id. 9,696; The General Cass, Id. 5,307; Bernhard v. Creene, Id. 1,349; The North Cape, Id. 10,316; Salvor Wrecking Co. v. Sectional Dock Co., Id. 12,273; Ex parte Easton, 95 U. S. 76; People v. Supervisors of Richmond County, 73 N. Y. 397; Simpson v. The Ceres, Case No. 12,881; The Canada, 7 Fed. 732; The City of Salem, 10 Fed. 843; Doolittle v. Knobeloch, 39 Fed. 40; Haller v. Fox, 51 Fed. 299. Followed in Baird v. Daly, 57 N. Y. 246; Drinkwater v. The Spartan, Case No. 4,085.]

2. A policy of insurance is a maritime contract, and therefore of admiralty jurisdiction.

See the opinion of Mr. Justice Johnson in Croudson v. Leonard, 4 Cranch [8 U. S.] 434, and Hale v. Washington Ins. Co. [Case No. 5,913].

[Cited in Hale v. Washington Ins. Co., Case No. 5,916; Gloucester Ins. Co. v. Younger, Id. 5,487; New England Marine Ins. Co. v. Dunham, 11 Wall. (78 U. S.) 35; Insurance Co. of Pennsylvania v. The Waubanshene, 24 Fed. 559.]

3. Courts of common law have a jurisdiction concurrent with the admiralty over maritime contracts.

[Cited in The Gilbert Knapp, 37 Fed. 209; Steele v. Thacher, Case No. 13,348; Plummer v. Webb, Id. 11,233; New Jersey Steam Nav. Co. v. Merchants' Bank, 6 How. (47 U. S.) 420; Hill v. The Golden Gate, Case No. 6,491.]

[4. Cited in Leland v. The Medora, Case No. 8,237, to the point that the last bottomry bond is to be paid in preference to any former ones.]

Mr. Selfridge, for libellant.

Mr. Welsh, for respondents.

STORY, Circuit Justice. This is a libel brought in the district court upon a policy of insurance, alleging it to be a maritime contract, of which that court, as a court of admiralty and maritime jurisdiction, has cognizance. There is a plea to the jurisdiction, and the present question rests solely on the general sufficiency of that plea as a declinatory bar. It has been argued, and now stands for judgment. I shall make no apology for the length of this opinion. The vast importance and novelty of the questions, which are involved in this suit, render it impossible to come to a correct decision without a thorough examination of the whole jurisdiction of the admiralty. I shall, therefore, consider, in the first place, what is the true nature and extent of the ancient jurisdiction of the admiralty; in the next place, how far it has been abridged or altered by statutes, or by common law decisions; and in the last place, what causes are included in the delegation by the constitution to the judicial power of the United States of "all cases of admiralty and maritime jurisdiction."

The admiralty is a court of very high antiquity. It has been distinctly traced as early as the reign of Edward the First. Fitz-

---

[1] "This case is a very remarkable one, being, in truth, a learned and elaborate essay on admiralty jurisdiction, and one of the most elementary and luminous views of the subject extant. This great opinion ought to be thoroughly studied by those who aim at solid attainments in this department of the law." 2 Hoff. Leg. Study (2d. Ed.) p. 465.

[2] [Reported by John Gallison, Esq.]

[3] This case, and the doctrine here laid down, has been expressly recognized in Plummer v. Webb [Case No. 11,233]; Steele v. Thacher [Id. 13,348]; Drinkwater v. The Spartan [Id. 4,085]; The Mary [Id. 9,187]; The Tilton [Id. 14,054]; Andrews v. Essex F. & M. Ins. Co. [Id. 374]; The Tribune [Id. 14,171]; The Volunteer [Id. 16,991]; Case v. Woolley, 6 Dana, 21. See Curt. Treat. Seam. 252, 253, 260. See, however, Ramsay v. Allegre, 12 Wheat. 25 U. S.] 638, where Mr. Justice Johnson does not consider the doctrine here laid down as settled. See the whole of his elaborate and learned opinion, from page 416 to 640. See, also, Bains v. The James & Catherine [Case No. 756], where the same doctrine is again discussed in an elaborate opinion of Mr. Justice Baldwin.

Avowry, 192; Selden on Fortescue, 67, note e to c 32); Zouch, Adm. Jur. 114; Spel. Gloss. voce "Admiral;" Godolphin, Adm. Jur. 22–30; Exton, Adm. Jur. 3; Seld. de Dom. Maris. lib. 2, c. 16, p. 161; Id. c. 24; 12 Coke, 79. If it be not of immemorial antiquity, as Lord Coke supposes (Co. Litt. 11b, 260b; Greenway v. Barker, Godb. 260; 2 Brownl. & G. 16), it is almost certain, that its origin may be safely assigned in some anterior age. Godolph. 29; Burroughs, Sover. of British Seas, 7–9; Seld. de Dom. Maris, lib. 2, cc. 14–16. 24; 2 Brown, Adm. 24; 1 Valin, Comm. 1. There is strong probability of its existence in the reign of Richard the First, since the Laws of Oleron, which were compiled and promulgated by him on his return from the Holy Land, have always been deemed the laws of the admiralty, and could not have been fully enforced in any other court. Seld. de Dom. Maris, lib. 2, c. 24, p. 206; Seld. ad Fletam, c. 8, § 5; Godolph. 143–146; Roughton's Articles, art. 19, and notes C 16, and C 17 in Clerke, Prax. 121; Co. Litt. 11b., 260b.; 3 Reeve, Eng. Law, 198; Exton, 24, etc., 38. And the learned Selden has shown considerable evidence of its juridical authority in the reign of Henry the First. Seld. de Dom. Maris, lib. 2, c. 24, p. 209.

What was originally the nature and extent of the jurisdiction of the admiralty cannot now with absolute certainty be known. It is involved in the same obscurity, which rests on the original jurisdiction of the courts of common law. It seems, however, that, at a very early period, the admiralty had cognizance of all questions of prize; of torts and offences, as well in ports within the ebb and flow of the tide, as upon the high seas; of maritime contracts and navigation; and also the peculiar custody of the rights, prerogatives, and authorities of the crown, in the British seas. The forms of its proceedings were borrowed from the civil law (Zouch, 88; Seld. ad Fletam, c. 8, § 4; Co. Litt. 11b), and the rules by which it was governed, were, as is every where avowed, the ancient laws, customs and usages of the seas. 3 Reeves, Eng. Law, 198; Exton, 33; Seld. ad Fletam, c. 8, §§ 5, 6; Vin. Abr. p. 506, pl. 8. In fact, there can scarcely be the slightest doubt, that the admiralty of England, and the maritime courts of all the other powers of Europe, were formed upon one and the same common model; and that their jurisdiction included the same subjects, as the consular courts of the Mediterranean. Exton, 44, 46, 49, 53; 1 Valin, Comm. 1, 120; Roccus, Assecur. note 80; Cleirac, Juris. de la Marine, 191; Zouch, 87. These courts are described in the Consolato del Mare, as having jurisdiction of "all controversies respecting freight; of damages to goods shipped; of the wages of mariners; of the partition of ships by public sale; of jettison; of commissions or bailments to masters and mariners; of debts contracted by the master for the use and necessities of his ship; of agreements made by the master with merchants, or by merchants with the master; of goods found on the high seas or on the shore; of the armament or equipment of ships, gallies or other vessels; and generally of all other contracts declared in the customs of the sea. Compare Consolato del Mare (Ed. Casaregis) c. 22; Cleirac, Us et Cout. Jurisd. de la Marine, art. 1, note 3, 192; Consulat de la Mer, par Boucher, c. 22; Zouch, 90; 2 Brown, Adm. 30.

In support of these observations, it may not be unfit to trace the early history of the jurisdiction of the admiralty in some of the more ancient records, which have escaped the ravages of time.

The Black Book of the Admiralty asserts, that in the reign of Henry the First, and in the time of many kings before ("en temps du premier roy Henry, et en temps de plusieurs rois devant"), when any man was indicted of felony, the admiral or his lieutenant delivered a capias to the admiral (the marshal) of the court, or the sheriff, to arrest him; and a very particular account is given of the manner of proceeding in case of his avoidance. See Clerke, Prax.; Rough. art. 122, note C 16, 17; Exton, 32; Seld. de Dom. Maris. lib. 2, c. 24, p. 209. Hence its existence and criminal jurisdiction may be inferred at that early period. The celebrated code of maritime laws, commonly called the Laws of Oleron, were compiled by Richard the First, as has been already observed, on his return from the Holy Land. Besides these, he promulgated several maritime ordinances at Grimsby for the government of the admiralty. Prynne on 4 Inst. 108; Exton, 26, 27, 182; Clerke, Prax. 113, C 18. In the reign of King John, several ordinances were made with reference to the admiralty; particularly the ordinance directing the admiralty to make inquisition of all persons unlawfully taking customs, or the fees called anchorage (Exton, 28, 29; Rough. art. 35, 36, note C 26; Clerke, Prax. 139, 140), and the famous ordinance for striking sail (or veiling the bonnet), in token of the superiority of the British sovereign over the adjacent seas. Clerke, Prax. 166; Burrough, Sovereignty, etc.; Seld. de Dom. lib. 2, c. 26, p. 215. In the reign of Henry the Third, the Laws of Oleron were ratified and republished. 1 Bib. Legum cites Prynne on 4 Inst. 108; 2 Brown, Adm. 39, 40. In the reign of Edward the First, there was a memorable ordinance prohibiting the courts having franchises, &c. from taking cognizance of any plea, exceeding 40 shillings sterling, touching merchants or mariners, as well by deed, as by charter of ships, obligations and other transactions; and further declaring, that every contract between merchant and merchant, or merchant and mariner beyond sea, or within the flood mark, shall be tried before the admiral, and not elsewhere.[4]

---

[4] "Ordonne estoit a Hastynges par le Roy Edw. le premier et ses seigneurs, que comment

The immemorial jurisdiction of the admiralty is still more emphatically asserted, as to all causes arising upon the British seas, in the record in the tower entitled, "De superioritate maris Angliae et jure officii Admiralitatis in eadem," in the 26th year of the same reign.[5]

But it is principally in the records of the reign of Edward the Third, that our attention should be closely drawn to the nature and extent of the jurisdiction of the admiralty; for to this period has the statute of 13 Rich. II., explicitly referred. Edward the Third gave to the laws of Oleron their final confirmation (2 Brown, Adm. 40), and called a solemn convocation of all the judges of the realm, among other things to retain and preserve the ancient superiority of the British seas, and the official rights of the admiralty.[6]

But the most venerable monument is the Black Book of the admiralty itself, which, though it contains considerable additions of later periods, is generally agreed to have been originally compiled in this reign. Exton, cc. 13, 14, p. 185, 191; Prynne on 4 Inst. 106, 115; Preface to Roughton's Articles, Clerke, Prax. 92. This book has always been deemed of the highest authority in matters concerning the admiralty. Besides the Laws of Oleron at large, it contains an ample view of the crimes and offences cognizable in the admiralty, and also occasional ordinances and commentaries upon matters of prize and maritime torts, injuries and contracts. See Roughton's articles in Clerke, Prax. 99, etc., 163, etc. Among other things, it prohibits the suing of merchants, mariners and other persons at the common law for any thing appertaining to the marine law of ancient right.[7] In respect to torts and injuries, the jurisdiction is most explicitly asserted, as well in ports within the ebb and flow of the tide, as upon the high seas, as will appear from the slightest inspection of the articles of the admiralty, and particularly the inquisition at Queensborough in this very reign—49 Edw. III. See Rough. art. 7, D 26; Id. art. 8, D 27; Id. art. 12, D 87; Id. art. 21, D 65; Id. art. 22, D 66; Id. art. 25, D 45; Id. art. 26, D 47; Id. art. 29, D 50; Clerke, Prax. 110, 111, 116, 125, 126, 129, 130, 134; Exton, 172. And the binding authority of the Laws of Oleron and the customs of the sea in the court of admiralty is several times alluded to and enforced in the same inquisition.[8] Indeed, of such high repute were these laws, that by an ancient edict of France, it was declared, that the admiralty ought to do justice

---

divers seigneurs avoient diverses franchises de trier plees ou ports, que leurs seneschaulx ni bailiffs ne tendroient nul plee, s'il touche marchant ou mariner, tant par fait comme par chartre de Nefs, obligacions, et autres faits, coment la somme amonte que a 20s. ou a 40s. et s'aucun est endite, qu'il a fait le contraire, et de ce soit convicte, il aura mesme le jugement comme dessus est dit." Chapter 20. "Chacun contract fait entre marchant et marchant, ou marchant ou mariner outre la mer, ou dedans le flode mark, sera trie devant l'Admiral, et nenient ailleurs, par ordinance du Roy Edw. et ses seigneurs." Chapter 21. Clerke, Prax. 144. And in Roughton's Articles the same is thus given. (38) "Item, inquiratur de hiis seneschalis et ballivis quorumcunque Dominorum per costeras maris dominia habentium, qui tenent, vel tenere usurpant, aliquod placitum mercatores vel marinarios concernens, excedens summam 40s. &c. Et haec est ordinatio Edvardi primi apud Hastings, regni sui anno secundo. Et Nota, quod quilibet contractus initus et factus inter calcatorem, et mercatorem, marinarium aut alios, ultra mare, sive intra fluxum maris, vel refluxum, vulgariter dictum flood mark, erit triatus et determinatus coram admirallo, et non alibi, per ordinationem praedictam." Clerke, Prax. 143, 144.

[5] Burrough, Sovereign, 8; Godolph. 28; 4 Inst. 142; Prynne on 4 Inst. 109; Selden de Dom. lib. 2, cc. 19, 24, 28; Exton, 58. After reciting the immemorial right of the King of England to the sovereignty of the British seas, and the right to make laws to regulate navigation, and to keep the peace, in those seas, it proceeds: "Et A de B., admiral de la dit mier, deputey par le roy d'Engliterre et tous les aultres admirals par mesme celui roy d'Engliterre et ses ancestors, jades roys d'Engliterre, eussent est en paiseable possession de la dit sovereign garde, ove la conisance et justice et tous les aultres appurtenances avantditz, &c. especialement pur empechement metre et justice faire, surete prendre de la pees de tout manere de gentz usantz armes en la dit mier ou menans niefs aultrement appareilles ou garnies, que n'appartient au nief de marchants, et en aultres points, en queux homme poit avoir reasonable cause de suspicion vers eux de robbery ou des aultres mesfaitz."

[6] The article stands thus: "Item, ad finem quod resumatur et continuetur, ad subditorum prosecutionem, forma procedendi quondam ordinata et inchoata per avum domini nostri regis (Evardum I.) et ejus consilium, ad retinendum et conservandum antiquam superioritatem maris Angliae et jus officii admirallatus in eodem, quoad corrigendum, interpretandum,

declarandum, et conservandum, leges et statuta per ejus antecessores, Angliae reges, dudum ordinata ad conservandum pacem et justiciam inter omnes gentes nationis cujuscunque per mare Angliae transeuntes, et ad cognoscendum super omnibus in contrarium attemptatis in eadem, et ad puniendum delinquentes, et damna pacis satisfaciendum; quae quidem leges et statuta per Dominum Richardum, quondam regem Angliae, in reditu suo a terra sancta correcta fuerunt, interpretata, declarata et in insula Oleron publicata, et nominata in lingua Gallicana 'Le Roy Oleroun.'" Burrough, Sovereignty, 10; Selden de Dom. lib. 2, cc. 32, 24; Godolph. 143; 4 Inst. 144; Exton, 25, 61.

[7] "Soit enquis de tous ceulx qui empledent aucuns merchant, mariner, ou autre homme quelconque a la commune ley de la terre appartenant a ley marine d'auncien droit. Soit enquis de tous juges, qui tiennent devant ceulx aucuns plees appartenants par droiture a la Court de l'Admiraltie." Or as Roughton renders it, "Inquiratur de hiis, qui implacitant aliquos, alibi quam in curia admiralitatis, de his negotiis seu causis, quae ad forum admiralitatis pertinere noscuntur." Rough. art. 18, and note C 35, D 51, D 52; Clerke, Prax. 120; Rough. art. 38; Clerke, Prax. 143.

[8] "Soit enquis de tous mariners, qui mettent en violence main, ou battent leur maistres encontre les loys de la mer et statuts d'Oleron sur ce faitz." Rough. art. 25, note D 45; Clerke, Prax. 129; Rough. art. 26, D 16; Clerke, Prax. 131.

according to the rights, judgments and usages of Oleron. Zouch, 88.

As to maritime contracts, the jurisdiction of the admiralty is expressly affirmed in the same book over all such contracts made abroad and within the flood mark. Rough. art. 38, c. 21; Clerke, Prax. 143, 144. And as to all causes, it is commanded that the admiralty shall do right and justice summarily and by plain process according to the marine law and the ancient customs of the sea.[9] And here it may be proper to guard against the mistake, that the particulars enumerated in these various regulations and ordinances comprehend and limit the whole extent of the jurisdiction of the admiralty. They cannot legally be considered in any other light, than as occasional directions to a court already existing with general powers, to clear away a doubt or to enforce more exactly an observance of an existing right or duty.

The commissions too of the judges of the admiralty in this and the preceding reigns evince a very extensive cognizance over maritime transactions, as well in ports as on the high seas. The admiral is frequently styled therein, in reference to his judicial authority, "custos maritimarum partium," "custos portuum cum costra maris," "custos marinae," "custos portuum et marinae," "capitaneum et admirallum flotae marinae nostrae omnium marium, et tamquamque portuum, &c. quam aliorum portuum et locorum per costeram maris" (Exton, 15, 70, 76; Seld. de Dom. lib. 2, c. 14); and finally (as in the commission of Robert de Herle in 35 Edw. III. as having "plenam, tenore patentium, potestatem audiendi querelas omnium et singulorum de hiis quae officium admiralli tangunt et cognoscendi in causis maritimis, &c."[10]

Such are some of the relics of antiquity, which are to be found in the learned treatises on the admiralty jurisdiction. From a historical review of them; from the consideration that in all other states in Europe, maritime courts were about the same period established, possessing the same jurisdiction, viz. over all maritime torts, offences, and contracts, proceeding by the same forms, viz. the forms of the civil law, and regulated by the same principles, viz. the ancient customs of the sea; from the consideration, that commercial convenience, and even necessity, at the same period, required a court of as extensive jurisdiction in England, and the acknowledged fact, that from its earliest traces the admiralty of England is found exercising a very extensive maritime authority, governed by the rules and forms of proceeding of the civil law, and, where statutes were silent, by the usages of the sea; from all these considerations it has been inferred, and, in my judgment, with irresistible force, that its jurisdiction was coeval and coextensive with that of the other foreign maritime courts. At all events, it cannot be denied upon these authorities, that before and in the reign of Edward the Third the admiralty exercised jurisdiction, 1. Over matters of prize and its incidents. 2. Over torts, injuries, and offences, in ports within the ebb and flow of the tide, on the British seas and on the high seas. 3. Over contracts and other matters regulated and provided for by the Laws of Oleron and other special ordinances, and 4. (as the commission of Robert de Herle shows) Over maritime causes in general. And even Lord Coke admits, that maritime causes include causes arising upon the sea, shore and in ports; for he declares "maritima est super littus or in portu maris." Hawkeridge's Case, 12 Coke, 129. That this jurisdiction was, from its original establishment, exclusive of the courts of common law in all cases, may perhaps admit of doubt; for it appears from some early cases, on which we shall have hereafter occasion to comment, that the courts of common law did, in some few instances, assume authority to adjudicate upon cases arising upon the seas. But that there is any authority previous to the 13 Rich. II., which, properly considered, impeaches the jurisdiction of the admiralty, as here asserted, may be with some confidence denied.

Let us now proceed to consider such cases, as have been supposed to impugn or weaken the conclusions, which have been attempted to be drawn thus far in favor of the admiralty. And here we must rest altogether upon the citations of Lord Coke in his view of the admiralty jurisdiction in his fourth Institute. 4 Inst. 134. It is well known with what zeal, ability, and diligence, he endeavored to break down the court of chancery, as well as the admiralty. It would have been fortunate for the maritime world, if his labors in the latter case had been as unsuccessful, as in the former. There are many persons, who are dismayed at the danger and difficulty of encountering any opinion supported by the authority of Lord Coke. To quiet the apprehensions of such persons, it may not be unfit to declare, in the language of Mr. Justice Buller, that "with respect to what is said relative to the admiralty jurisdiction in 4 Inst. 135, that part of Lord Coke's work has been always received with great caution, and frequently

---

[9] "En primes pour faire droit et due justice a toutes parties, si bien poursuyants comme defendants, en la Cour de l'Admiraltie, est de faire sommaire et plain process selon loy marisne et anciennes coustumes de la mer." Clerke, Prax. 160, D 71.

[10] The words of this commission are: "Dantes ei plenam, tenore patentium, potestatem audiendi querelas omnium et singulorum de hiis, quae officium admiralli tangunt, et cognoscendi in causis maritimis, et justitiam faciendi, et excessus corrigendi, et delinquentes juxta eorum demerita castigandi, puniendi, incarcerandi, et incarceratos, qui deliberandi fuerint, deliberandi, et omnia alia, quae ad officium admiralli pertinent, faciendi, &c., &c." Exton, 3, 294.

contradicted. He seems to have entertained not only a jealousy of, but an enmity against, that jurisdiction." Smart v. Wolffe, 3 Term R. 348.

The first citation of Lord Coke is of two writs in the register (Fitzh. Nat. Brev. 87, 88), one for taking and carrying away a ship found at H. and the chattels on board of the same ship; [11] the other for drawing wine out of a tun put on board a ship at S. to be brought from thence to S. and filling up the tun with salt water.[12] It is difficult to perceive in what manner these writs can touch the admiralty jurisdiction, for the torts are not even in the writs supposed to be upon the high seas, or within the ebb and flow of the tide.

The next citation is a writ in the register (Fitzh. Nat. Brev. 114), which is thus described by Fitzherbert. "If an English merchant be robbed and his goods be taken from him, beyond seas, by merchant strangers, and the English merchant sue beyond sea to have justice and restitution made thereof, and cannot obtain it, and this matter be testified unto the king in his chancery by divers credible persons; now, upon this testimony, if the merchant strangers come into any place within the realm of England with their goods, then the English merchant shall have a writ out of chancery directed unto the mayor or bailiffs, where such merchant strangers are with their goods, to arrest them and their goods, and to keep them under arrest until they have satisfied the party his damages, which he hath sustained by reason of their misdoing."—"But it seemeth the English merchant shall not have such writ for any debt due to him from a merchant stranger upon a contract made beyond seas, if the merchant do come into England or his goods; quaere tamen hereof."—In the register itself (page 129) the tort is thus alleged "quodcum ipse nuper apud C. in partibus de Spinia in villa de C. causa mercandisandi moram traxisset, et bona et catalla ad valentiam centum librarum emisset. J. et T. et alii malefactores dictae villae mercatores de dictis partibus de S. prefatum S. apud dictam villam de S. vi et armis ceperunt et imprisonaverunt, et catall sua predicta ab eo abstulerunt, et alia, &c. ei intulerunt, contra legem et rationem in ipsius S. damnum non modicum, et depauperationem manifestam." It is manifest that this writ merely respects a

<hr>

[11] S. W. 50, Hen. III. cited in Selden on Fortescue de Laud, c. 32, note e; Register Brev. 95. "Quare vi et armis quandam navem ipsius A. precii decem librarum apud H. inventam cepit et abduxit, et bona et catalla sua ad valentiam viginti librarum in eadem navi inventa cepit et asportavit."

[12] Register Brev. 95b. "Quare vi et armis 60 lagenas de quodam dolio vini ipsius W. precii quinque marcarum in navi predicti I. apud S. posito, abinde usque S. ducendo, extraxit, et dolium illud aqua maritima implevit, per quod &c."

trespass to the person and goods of an English merchant committed in the territory of a foreign sovereign; a subject, over which the admiralty never claimed, or exercised any judicial authority. And perhaps it may be inferred from the language of Fitzherbert, that the common law courts did not originally take cognizance of contracts between merchants in foreign countries; and we shall in fact find, that the admiralty did claim to exercise jurisdiction over them at a very early period. Clerke, Prax. 143, 144, C. 21.

Another citation is from Fitzherbert's Abridgment. Corone, 399, in 8 Edw. II.; Staund. Pl. Cor. lib. 1, p. 51, 57. It stands thus. "Nota per Stanton Justice, que ceo nest pas sauce de mere ou home puit veier ceo que est fait bel un part del ewe et del autre, come a veier de l'un terretanque a l'autre, que le coroner viendra en ceo cas et fera son office, auxi comme aventure a vyent en un brace del mere, la ou home puit veier de l'un parte tanque a l'autre, del aventure, que en cel lieu avient, puit paiis aver conusance." The opinion here maintained is, that it is not a creek of the sea, where a person may see what is done from both shores; and that in such place the coroner may exercise his official jurisdiction, as he well may in an arm of the sea, where an accident happens, which may be seen from both shores, for in such case the pais may have cognizance thereof. In respect to the first part of this opinion, it cannot be supported; for a creek, or, (what is the same thing) an arm of the sea, is where, and as far as, the sea flows and reflows, without any reference to the distance of the enclosing shores. 22 Assiz. 93; Hale, De Portubus Maris, c. 4. And admitting, that the opinion of a single judge, (on what occasion we know not,) is to be considered as settling the law, the residue of the opinion proves no more, than that, in those ancient times, in such creeks of the sea the coroner had jurisdiction. Yet from this Staundford, and after him Lord Coke, infer that the admiralty had no jurisdiction in those places, but only upon the high seas. Staundf. lib. 2, p. 51. This inference is inadmissible, since there is very strong evidence, that, at and before the same period, the admiralty exercised authority in the creeks, arms and ports, of the sea; and so the jurisdiction could at most be only concurrent. Lord Hale explicitly asserts, that in ancient times the common law exercised jurisdiction, concurrent with the admiralty, over crimes committed even upon the narrow seas or coasts, though it were high sea; and that this jurisdiction did not cease until about the 38 Edw. III.; and, among other cases in support of his opinion, he cites this very case in 8 Edw. II., and infers from it, that in the present times, as well the coroner of the county, as of the admiral, may take inquisitions upon deaths happening in great rivers, namely, arms of the sea, that flow and re-

flow, beneath the first bridges (2 Hale, P. C. 12, 13, note a, 14, 15, 16); and that, notwithstanding the statute of 28 Hen. VIII. c. 15, the courts of common law have still a concurrent jurisdiction of all felonies committed in a navigable arm of the sea (2 Hale, P. C. 18. And see Zouch. 114; 40 Assiz. 25; Rex v. Soleguard, Andr. 231). Admitting then, that this case is good proof of the jurisdiction of the common law, it is not shown to be exclusive of that of the admiralty, but is perfectly consistent with it.

The next case is 43 Edw. III. (cited in Dyer, 326), which decides no more than, that marsh land, bordering on the sea, over which the sea ebbs and flows, may be parcel of a manor; from which Lord Coke infers, that it must be parcel of the county. Assuming this inference to be correct, it does not follow, that the jurisdiction of the admiralty is excluded; for in Sir Henry Constable's Case, 5 Coke, 105b, 107, it was clearly held, that the soil, on which the tide ebbs and flows, may be parcel of a manor, and yet that the common law and the admiralty have there a divided empire. the former when the tide ebbs, and the latter when it flows.

The next case is 5 Edw. III. p. 3 (Id. Fitzh. Abr. "Replevin" 41). It was a replevin for goods taken in the vill of W.; the defendant justified, that he took them, as wreck of the sea, by virtue of a franchise of wreck appendant to his manor; and the whole case turned upon a mere point of pleading. There is nothing in it touching the admiralty; and the only possible deduction from it is, that a plea of wreck of the sea was sustained in a court of common law; but nothing can thence be argued, that this was an exclusive jurisdiction. S. P. in 37 & 38 Hen. III., cited Fortes. de Laud. c. 32; Selden's note e.

The next case (43 Edw. III.) stands thus in Fitzherbert's Abridgment (Conusance, 36): "Trespass fait en Kingston sur Hull, port pur A. d'un nyeff prist en le ew de Hull versus certen persons. Le maire et bayles de Hull demandent conusance par chartre le roye a eux grant, quod cives nec burgesses de Hull non implacitentur alibi de aliquibus transgressionibus, conventionibus, contractis infra burgum, quam infra burgum; et fuit challenge eo que l'un partie fuit estranger, et nient burgess, et auximent semble que il n'est enclose en ceux parolx que ils puissont tener plees. Finchdon dixit sic; et pur ceo le conusans fuit graunt," &c. It would seem from the reasons assigned by Finchdon, that the conusance ought to have been, and in fact was, denied; and that the word "non" was omitted in the abridgment by mistake. But Lord Coke asserts that it was granted, and that this "proveth that the haven of Hull, where the ship did ride, was infra burgum de Hull, and by consequence infra corpus comitatus, and determinable by the common law and not in the admiral court." The case authorises no such conclusion. It does not appear, that the

place where the ship was taken, was within the ebb and flow of the tide, but only that it was "on the water of Hull;" much less does it appear, that any point, as to the right of the admiralty to entertain suits for acts done in ports, was even glanced at, or put into controversy. The case turned wholly on the claim of the corporation of Hull to withdraw suits arising within its franchises from the courts of common law. For aught that appears, Hull might have had the franchise to hold pleas of things done on tide waters, as it is unquestionable the corporation of Ipswich had. Exton, 138, 142. And even if the claim of conusance by Hull were well founded, it does not follow that a concurrent jurisdiction might not still remain in the admiralty over all things within its general authority. See Rex v. Soleguard, Andr. 331.

The next case is 48 Edw. III. p. 3, in which it would be supposed from Lord Coke's manner of quoting, that it was adjudged "if a mariner make a covenant with me to serve me in a ship upon the sea, yet, if his wages be not paid, they shall be demanded in this court by the common law, and not by the law of mariners,"[13] or the marine law. In fact, on examining the year book, it is incontestable that this was the mere argument of Tankard, as counsel in the cause, and it was not in any manner recognised by the court. Nor did the case in judgment require any such observation. It was an action brought, among other things, for a sum due on a retainer to serve in the war in France; and the exception taken was, that this was triable before the court of the constable and marshal, being of a service in war out of the realm. Finchdon, however, held, that the courts of common law had cognizance of the cause. It is manifest upon this statement, that nothing can be gathered from this case in favor of Lord Coke's favorite position. But there is a pretty strong implication in the argument, that mariners' wages were, at that time, claimed as within the cognizance of the maritime court. And Lord Holt himself has declared (Brown v. Benn, 2 Ld. Raym. 1247) that the jurisdiction of the admiralty, in case of mariners' wages, was a very ancient concurrent jurisdiction, as ancient as the constitution itself (S. P., Queen v. London, 6 Mod. 205). And it should never be forgotten, that this dictum of counsel, frail and untenable as it is, is the only authority previous to the 13th of Richard II., which the diligence of its most strenuous foe has been able to adduce, to take from the admiralty its jurisdiction over maritime contracts. All the other cases apply to the jurisdiction over torts and injuries in ports or in arms of the sea.

But the case, which is mainly relied on against this jurisdiction, is that in the time of Edward the First, as cited in Fitzherbert's Abridgment (Avowry, 192). It stands thus,

---

[13] "Et ne pur la ley de mariner."

"Replevin de son nyeff prise en le cost de Scarburgh en le mere, et dillonques fist carier en le conte de N. et la le detient, &c. Muttford: Il se pleint de prise en le cost de S., que n'est ville ni liew certen par que pais puit estre prise, quare le cost dure 4 leuks, et auxi de chose fait en le mere cest court ne puit aver conusans, quare certen jugement est done as mayners. Bery: Le roy voit que le pease soit cy auxi bien gard en le mere, come en le terre, et nous trovomus que vous estes venu per due proces, et ne veiomus riens pur que ne deves respondre. Muttford: Il suppos le prise estre fait en la counte de E. et il port son breve al vicecomte de M. [N.] d'aver delivere, et issint suppos le distress prise et amesne de un counte en auter, par que il ad breve don per le statut en ce cas. Howard: Le statut parle des avers amesnes de un counte en auter, et ne des che'ux. Muttford: Le statut parle generalment de distress, que comprehend de ambideux. Howard: Jeo ne crey que je usse eu sur le statut. Muttford: Donques usses eu le vi et armis, car ceo chose encountre le pese et chescun que doit distrein, doit le distres poser en ceo liew ou la deliverance puit estre fait al comen ley. Howard pria conge d'enquerer meliour brief." This is the whole case, from which Lord Coke draws (4 Inst. 140, and 12 Coke, 79) the following extraordinary conclusions. 1. That it is called the sea, which is not within any county from whence a jury may come. 2. That the sea (being not within any county) is not within the jurisdiction of the court of common pleas, but belongs to the admiral jurisdiction. 3. That when the ship came within the river, then it is confessed to be within the county of Northumberland. 4. That when a taking is partly on the sea, and partly in a river, the common law shall have jurisdiction. 5. And (12 Coke, 79) that if a thing be done upon the sea hors del county, the party may plead to the jurisdiction of the court.

As to these conclusions, many remarks might be made. It is true, that Muttford, of counsel for the defendant, did assert that the courts of common law had no jurisdiction of things done upon the sea, for that a certain judgment,—which Lord Coke interprets as meaning the jurisdiction of the admiralty (12 Coke, 79),—is given among or to mariners. But Beryford, C. J., utterly denied it, and so far from allowing the claim of the admiralty to jurisdiction on the sea, or even admitting its legal existence, he expressly declared, that the king willed, that the peace should be kept, as well on the sea as on the land, and that, as the party was by due process before the court, he should be compelled to answer. Of what was he to answer? Of an alleged trespass upon the sea on the coast of Scarburgh. So that there is not any pretence that the injury arose in any port, or within any county of the realm. Nor is there any intimation by the court, that the taking, for which the suit was brought, was within any county, from which a jury might come; nor that the jurisdiction was sustained because, after the taking upon the sea, the ship was brought into port; nor that the sea was without the body of any county. On the contrary, the court expressly claims jurisdiction to keep the peace upon the sea, as well as upon the land, and overrule the objection of the counsel, as to the necessity of the act's being done in some place upon land, from whence a jury might come. So far, then, from its being true, as Lord Coke boldly asserts (12 Coke, 79), that "all these points are directly, without any strain, collected out of the said book," it may be safely affirmed, that not one of them derives any support or countenance from the report; but, as far as the case decides any thing, it is against them. And finally the case went off against the plaintiff upon his own prayer for a better writ. Nor is this all. The same case is more fully and exactly reported by Selden from a manuscript Year Book in his own possession, from which it is here recited verbatim (Selden on Fortescue, c. 32, note e): "William Crake de Hotham fuit sommon a respondre a Robert de Beufs, de play pour que il avoit prise une sune nief, pris de £40, en le mer juste la costere de Scardburgh, et de yleke le amene a Hotham en le counte de Norff. Muttford: Del hore qu'il avute counte de une prise fete en le mer que est hors del conte, issi que si pais se join fists, il ne savereint a quel visconte mander pur fere vener pays, e demand jugement, si ceyns pussont de ces conuster. Ed' autre part, il ly sont assigne Admirall de par le roy sur le mer, a oyer et terminer les pleynts de chose fait en mer, et n'entendons point, que vous volys a eux tolyr jurisdiction. Bery: Nous avons poer general pur my tut Engleterre mes del poer des Admiralls, dont vous parles, ne savons rien, ne rien de nostre poer a eux volumus assigner, si ceo ne seist per commandement le Roy, de quey vous ne monstres rien, &c. Muttf.: Sire, le luy, ou ils dient la neef este pris, n'est in nulle visne de que, &c. Howard: Il est issint visne, que si une homme occist un auter la il serra pris et amesn al terre e pende, aussi ben come pur fet fet sur le terre. Metingham: Nous vous dions que nous avons ausi ben poer de conisans de fet fet en mer come sur terre, dont agard que vous respondes ouster." This is undoubtedly an authentic report, and completely confirms the observations already made upon Lord Coke's extraordinary commentary. It is here explicitly stated by counsel, that the admiralty had jurisdiction to hear and determine all plaints of things done upon the seas; and that the supposed taking was upon the sea without any county. But Beryford, C. J., in answer said, "We have general jurisdiction throughout all England; as to the power of the admirals, of whom you speak, we know nothing, and we will assign to them none of our power, unless by command of the king, of which you

show nothing."—And upon the argument's being again pressed, that the taking was not in any ville or neighborhood, from which a jury might come, Metingham, J., declared, "we again say, that we have power to take cognizance of a thing done as well upon the sea, as upon the land; and we award you to answer over." It is clear, therefore, that the court did claim a common law jurisdiction over the sea at this time. And the learned Selden (who is not an advocate for the admiralty in general) accordingly remarks, "It seems to me by this, that in those times the common law had cognizance of things done upon the British sea, however afterwards it kept its limits infra corpus comitatus, leaving the sea to the admiralty;" and in his treatise upon the dominion of the sea, he deliberately asserts the same doctrine. Selden de Dom. mar. lib. 2, c. 14, p. 155; Id. c. 24, p. 209. In corroboration of this doctrine, there is in Molloy (book 2, c. 3, § 16, p. 224) a copy of a record in the tower of 24 Edw. III., in which an action was brought at common law for an embezzlement on board of a ship on the high seas ("in mari juxta Britanniam") and the plaintiff recovered judgment.[14]

Another case is 7 Rich. II., cited from Statham's Abridgment. "Transgressio" pl. 54. It is thus summarily stated, "En trans d'un neife et certen marchandises pris; Vavasour, Nous le prisomus en le haut mere ovesque les Normandes qu'eux sont ennemyes le Roy, jugement si actionem. Markham, Ceo amount a nient pluis que de riens coupable. Charleton, ceo ple est bone, per quod respondes a ceo." If this case prove any thing, it proves, that a capture on the high seas from the enemy may well be pleaded as a special plea and bar to an action of trespass for the capture; and that a court of common law will sustain such a plea. If it be supposed to affirm the jurisdiction of such a court over matters of prize, it is not law; if to deny it, it has nothing to do with the present controversy.

These are all the cases adduced by Lord Coke down to the 13 Rich. II., to disprove the jurisdiction, which has been asserted in favor of the admiralty. Unless I am very much mistaken, they entirely fail of their intended purpose; and leave the current of ancient authority flowing with an uniform and irresistible force in its favor.

Such then being the ancient or original jurisdiction of the admiralty, it will be in the next place proper to consider, in what respects it has been altered by statutes and decisions made since the period, of which we have been speaking.

The statute 13 Rich. II. c. 5, enacts, "that the admirals and their deputies shall not

---

[14] See, also, Spelman, Reliq. 217; 40 Assizes, 25; Zouch, 114; 2 Hale, P. C. 17; Sea Laws Treatise Dom. Sea, 145; and Exton, 121, etc., where he comments very satisfactorily on this very case.

meddle henceforth of any thing done within the realm, but only of a thing done upon the sea, according as it hath been duly used in the time of the noble King Edward [III.], grandfather of our lord the king that now is."[15] The statute 15 Rich. II. c. 3, enacts "that of all manner of contracts, pleas and quereles[16] (complaints or controversies) and of all other things done or arising[17] within the bodies of counties, as well by land as by water; and also of wreck of the sea, the admiral's court shall have no manner of cognizance, power nor jurisdiction; but all such manner of contracts, pleas and quereles, and all other things rising within the bodies of counties, as well by land as by water, as afore, and also wreck of the sea, shall be tried, determined, discussed and remedied; by the laws of the land, and not before or by the admiral, nor his lieutenant, in any wise. Nevertheless of the death of a man, and of a maihem done in great ships, being hovering in the main stream of great rivers, only, beneath the bridges[18] of the same rivers nigh to the sea, and in none other places of the same rivers, the admiral shall have cognizance; and also to arrest ships in the great flotes for the great voyages of the king and of the realm; saving always to the king all manner of forfeitures and profits thereof coming; and he shall also have jurisdiction upon the said flotes during the said voyages, only saving always to the lords, cities and boroughs, their liberties and franchises." The statute 2 Hen. IV., c. 11, provides, that the statute 13 Rich. II. be firmly holden and kept, and put in due execution; and that, as touching a pain to be set upon the admiral or his lieutenant, that the statute and the common law be holden against them; and and that he, that feeleth himself grieved against the form of the said statute, shall have his action grounded upon the case against him that doth so pursue in the admiral's court, and recover his double damages against the pursuant, and the same pursuant shall incur the pain of £10 to the king for the pursuit so made, if he be attained.

It was upon these statutes, that the controversies respecting the admiralty were so zealously and obstinately maintained during more than two centuries. It is not my intention to examine how far the statutes themselves or the preambles thereof, or the petitions, on which they were founded, have been fairly published from the records of the tower.[19] It will be sufficient for my

---

[15] "Que les admiralx et leur deputees ne soi mellent desorenavant de nulle chose fait deinz le Roialme, mais soulement de chose fait sur le meer selonc ceo q'ad este duement use el temps du noble Roy Edward aiel nostre seigneur le roy q'or est."

[16] "Contractees, plees et quereles."

[17] "Faitz ou sourdantz." Exton, omits "ou."

[18] "Pountz."

[19] Those who have curiosity to indulge in such speculations may receive a great deal of

purpose to show, what have been the constructions respectively urged by the advocates and the opponents of the admiralty, and to consider how far the respective opinions are reconcilable with themselves or with sound principles. In the construction of these statutes, the admiralty has uniformly and without hesitation maintained, that they never were intended to abridge or restrain the rightful jurisdiction of that court; that they meant to take away any pretence of entertaining suits upon contracts arising wholly upon land, and referring solely to terrene affairs; and upon torts or injuries which, though arising in ports, were not done within the ebb and flow of the tide; the language of those statutes, as well as the manifest object thereof as stated in the preambles, and in the petitions, on which they were founded, is fully satisfied by this exposition. So that consistently with these statutes, the admiralty may still exercise jurisdiction, 1. Over torts and injuries upon the high seas and in ports within the ebb and flow of the tide, and in great streams below the first bridges; 2. Over all maritime contracts arising at home or abroad; 3. Over matters of prize and its incidents. On the other hand, the courts of common law have held, that the jurisdiction of the admiralty is confined to contracts and things exclusively made and done upon the high seas, and to be executed upon the high seas; that it has no jurisdiction over torts, offences or injuries, done in ports within the bodies of counties, notwithstanding the places be within the ebb and flow of the tide; nor over maritime contracts made within the bodies of counties or beyond sea, although they are, in some measure, to be executed upon the high seas; nor of contracts made upon the high seas to be executed upon land, or touching things not in their own nature maritime, such as a contract for payment of money; nor of any contracts, though maritime and made at sea, which are under seal or contain unusual stipulations; and to complete the catalogue of disabilities, it has been strenuously held by Lord Coke, that the admiralty is not a court of record, and of course has no power to impose a fine, and that it cannot take a recognizance or stipulation in aid of its general jurisdiction. Thomlinson's Case, 12 Coke, 104; 4 Inst. 134; Empringham's Case, 12 Coke, 84; and cases cited in Cremer v. Tookley, Godb. 385, 387. So that, upon the common law construction of these statutes, the admiralty, as to contracts, is left with the idle and vain authority to enforce contracts, which are made upon the high seas to be executed upon the high seas. We shall have occasion hereafter to notice some extraordinary exceptions to these doctrines. Happily for the admiralty, it has been able to

regain the right to fine and punish for contempts (12 Coke, 52; 1 Vent. 1; Styles, 17), and to take and enforce stipulations (Hook v. Moreton, 1 Ld. Raym. 397; S. P., 2 Ld. Raym. 632; Greenway v. Barker, Godb. 261). But let it not be imagined, that the limited powers at present permitted to be exercised by the admiralty have been obtained without a struggle. From a historical review of the cases in the books, it will abundantly appear, that it has been constantly in danger of losing its most useful jurisdiction. On the other hand, the courts of common law, by a silent and steady march, have gradually extended the limits of their own authority, until they have usurped or acquired concurrent jurisdiction over all causes, except of prize, within the cognizance of the admiralty.— And even as to matters of prize, its exclusive authority was not finally admitted and confirmed until the great case of Lindo v. Rodney, Doug. 613, note, almost within our own times. It is curious indeed to observe the progress of the pretensions of the courts of common law in amplifying their jurisdiction. At first they disclaim all cognizance of things done without the bodies of the counties of the realm; and even over collateral matters done out of the realm, which came incidentally in question upon issues regularly before the courts. Mayn. Y. B. 613; 18 Edw. II.; Litt. lib. 3, § 440; 21 Edw. IV. p. 36; Doct. & Stud. bk. 2, c. 2; Fortescue, c. 32, p. 38; Seld. de Dom. Mar. c. 24, p. 209; and the cases cited in Cremer v. Tookley, Godb. 385, 387. They afterwards held cognizance of contracts originating within the realm, to be executed abroad; of contracts made abroad, to be executed within the realm; and finally, after much hesitation and doubt, by the use of a fiction, often absurd and never traversable, over all personal causes arising on the high seas or in foreign realms, without any regard to' the place of their transaction or consummation. See 1 Rich. III. 4 pl. 7; 32 Hen. VI. p. 25b.; 39 Hen. VI. p. 39; 11 Hen. VII. p. 6; Fitzh. Nat. Brev. 114; Dowdale's Case, 6 Coke, 46; Co. Litt. 261b; 4 Inst. 141, 142; Sir Henry Constable's Case, 5 Coke, 106; 12 Coke, 79; 2 Inst. 51; 2 Brownl. & G. 16; Tucker v. Cappes, 2 Rolle, 497; Spanish Ambassador v. Jolliff, Hob. 78; Zouch, 101, 125. Upon what principles of the ancient common law this extension of jurisdiction can be supported, it is difficult to perceive. It has, however, been established by the usage and decisions of ages; and now rests upon the same basis, and no other, that sustains the immemorial claims of the admiralty.

It will be necessary, in the subsequent examination of the doctrines which the common lawyers have asserted to support their construction of the statutes of Richard II., to class the cases, in order more effectually to investigate the principles upon which they are founded. Before, however, we proceed to that examination, it may be well to dis-

information from the learned labors of Doctor Exton. See Exton, c. 2, p. 288; Id. c. 5, p. 314; Id. c. 6, p. 331; Prynne, Animadversions, 78, 79.

pose of some of the cases cited by Lord Coke (4 Inst. 137, etc.), which cannot properly be reviewed in any other manner. Several of these may be dismissed in a few words. The cases in 12 Hen. VI. rot. 123, 124, in 38 Hen. VIII., and in Rastell's Entries, 23, do not appear to have been adjudged. The same observation applies to the cases of premunire in 38 Hen. VI. rot. 30, and 9 Hen. VII. Indeed, these cases seem open to a more decisive objection, for it is impossible, consistently with any reasonable interpretation of the statute 16 Rich. II. c. 5, or of any previous statute of premunire, to apply the words to the admiralty. The language of all of them is exclusively and directly pointed against the usurpations of the church of Rome; and there is not, as far as I have been able to trace, a single authority to support the dictum of Lord Coke, that a premunire lies against the admiralty. 3 Inst. 120. See Buckley's Case, 2 Leon. 182; Zouch, 116; Exton, 261. Indeed, the extravagance of his doctrines on this subject cannot be better illustrated, than by his pertinaciously including any excess of jurisdiction by the court of chancery in the same penalty; an opinion, which has been long since exploded. In respect to some other cases cited by him, it is impracticable to give any answer; because they are not so stated, as to present any particular points, and no reasons are assigned for the asserted judgments. See cases cited 4 Inst. 136, etc., and Godb. 261. Even the case of Burton v. Put, 6 Hen. VI. rot. 303, 4 Inst. 137, on which he so strenuously relies, is the mere naked statement of a record; and to make it at all applicable to his purpose, Lord Coke gratuitously assumes, that the taking of the ships was actually in the haven of Bristol, within the ebb and flow of the tide, whereas the record itself, as quoted by him, only states the taking to have been "infra corpus comitatus Bristoliae, et non super altum mare." It would seem also, that the ships were prizes taken out of the possession of the captors; for the taking is alleged to be with the plaintiff's prisoners and merchandises on board; and if so, whatever doubts might then exist, it is now clear that the admiralty had jurisdiction. Be this as it may, inasmuch as no reasons are given for the judgment, it cannot be admitted, that it warrants the inferences of Lord Coke. The action was founded on the statute of 13 Rich. II., enforced by 2 Hen. IV. c. 21, which prohibits the admiral to meddle, but only of a thing done upon the sea, according as had been done in the reign of Edw. III. If, at that time, the admiralty had jurisdiction over torts done on tide waters within ports (as it seems to me incontestible it had), there could be no ground to support the action, if the taking was on tide waters in Bristol; and the verdict of the jury would fairly warrant an inference, that the taking was not in the haven of Bristol on such

waters, but in some place out of the ebb and flow of the tide. Zouch, 116. It is useless however to comment upon a case, the circumstances of which are not so stated, as to raise any distinct questions.[20]

As to the dictum in 30 Hen. VI. p. 6, respecting the admiralty judges, that "the place and things of which they hold plea, are out of the realm,"[21] if it means to speak of the realm in its largest sense, it will include the British seas (Co. Litt. 259b; 1 Rolle, Abr. 528 l. 13), and is not law; if in a more narrow sense, as including only the bodies of the counties, it will be fully considered hereafter.

Let us now pass to the consideration of the reasons alleged, in the construction of the statutes of Richard II., to exclude the jurisdiction of the admiralty in ports and havens, within the ebb and flow of the tide. As far as these reasons can be gathered from the imperfect light of reports, and from the laborious commentaries of Lord Coke, they resolve themselves into the following propositions. 1. That the body of every county includes all navigable salt waters, "where one may see what is done on the one part of the water and on the other, as to see from one land to the other." 2. That the sea is, ex vi termini, without the body of any county. 3. That all ports and havens are within the bodies of counties. 4. That where the common law hath jurisdiction it excludes the admiralty, and the common law hath jurisdiction in ports and havens.

In respect to the first proposition, it undertakes to define the boundary of a county on the sea coast at common law. The only authority in support of this definition is the opinion of Stanton, J., in 8 Edw. II., already cited (Fitzh. Abr. Corone, 399); for neither Staundford (Staund. P. C. 51) nor Lord Coke pretend to assert it upon any other ground. And even Stanton, J., does not state, that such waters are within the body of a county, but only that the coroner has jurisdiction there; and we have already shown, that in early times coroners and sheriffs exercised a concurrent authority, even upon the high sea itself. Seld. de Dom. Mar. lib. 2, c. 14; Zouch, 114; Spelm. Reliq. 217; 2 Hale, P. C. 17–19. Indeed Lord Hale, in quoting this very case (De Portubus Maris, c. 4, p. 10), considers it as no absolute proof; for he says, "an arm of

---

[20] It is not a little remarkable, that no actions founded on this statute, for an alleged tort or trespass in ports, are cited in the books, except this case and two others (12 Hen. VI. rot. 123, 124; 4 Inst. 138, 139), which do not appear to have been adjudged. All the other cases reported are upon contracts. Dyer, 159; Godb. 385; Cro. Jac. 603; 1 Rolle, 415; 3 Bulst. 205; 31 Hen. VI. in 4 Inst. 138. The prohibitions so frequent in the books were probably founded on the statute. 15 Rich. II. c. 3.

[21] "Le lieu et les choses dount ils tiendront plea sont hors del roialme."

the sea, which lies within the fauces terrae, where a man may reasonably discern between shore and shore, is, or at least may be, within the body of a county." And it is undoubtedly true, that by ancient grant or statute an arm of the sea may be within the bounds of a county; and perhaps as to all navigable rivers, where the tide ebbs and flows, since the statute 15 Rich. II. c. 3, the admiralty jurisdiction may be well held to be excluded in all places above the first bridges next to the sea. Exton, 127, etc.; 2 Hale, P. C. 16, 17. And this would be a satisfactory answer to the cases cited by Lord Coke in 4 Inst. 139, 141 (7 Hen. VI. pp. 22, 25;[22] 16 Hen. VIII.; 35 Hen. VIII.; and 36 Hen. VIII.). But to maintain that this is true by the mere force of the common law, something more is necessary than so imperfect a case as that of 8 Edw. II., which, if ever, was adjudged at a time, when the jurisdiction of the common law was concurrent with the admiralty upon the high seas. Zouch, 114; Seld. de Dom. Mar. lib. 2, c. 14, pp. 156, 560, 106; Andr. 231; Exton, 155. Besides, in Violett v. Blake, 2 Rolle, 49, this very case of 8 Edw. II. was by the judges denied to be law, though it was affirmed in some other cases. Owen, 122.

On the other hand, in Sir Henry Constable's Case, 5 Coke, 106, etc., it was expressly adjudged, as has been already stated, that the soil, on which the sea ebbs and flows, may be parcel of a manor, and that, when the sea flows and has plenitudinem maris, the admiral shall have jurisdiction of every thing done on the water, between the high and low water mark, by the ordinary and natural course of the sea; and yet, when the sea ebbs, the land may belong to a subject, and every thing done on the land, when the sea is ebbed, shall be tried at common law, for it is then parcel of the country, and infra corpus comitatus; and so, between the high and low water mark, the common law and the admiralty have divisum imperium. It is probable that the court meant here to speak of land on the open sea coast; but it is very difficult to perceive, why the same principle should not apply as to the tide waters in ports of the sea. If land on the sea coast when the tide is out, be to low water mark within the body of the county, and yet when the tide is at flood, it is deemed within the admiralty jurisdiction, because it is then the sea, why should not the same doctrine apply to the ebb and flow of the tide in ports and havens? Until some strong reason can be assigned for a distinction, it would seem more conformable to law and nature to hold, that the bodies of counties, bounding on navigable waters, are limited at all times by the line of the sea tide; and this is the doctrine asserted by the admiralty. Exton, c. 3, p. 80; Id. c. 4, p. 87; Id. c.

8, p. 121; Zouch, 110; Lacy's Case, Moore, 121. But see 2 East, P. C. 803; Bac. Abr. "Courts of Admiralty," A.

In the next place, it is asserted, that the sea, ex vi termini, imports salt-water without the body of a county, by the definition of the common law. The authority principally relied on, to support this position, is the case in Edward the First's time. Fitzh. Abr. "Avowry," 192; 4 Inst. 140; 12 Coke, 79. That case has been already fully considered, and it is clear, that it does not, in any manner, warrant the assertion. On the other hand, Lord Hale (De Portubus Maris, c. 4, p. 10), in defining what the sea is, says, that it is either, that which lies within the body of the county or without; that arm, or branch of the sea, which lies within the fauces terrae, is, or at least may be, within the body of a county; that part, which lies not within the body of a county, is called the main sea, or ocean.[23] And his lordship is well warranted in this distinction of definition by authority. Besides the cases already cited (in 22 Assizes, 93, and 5 Coke, 107), it was held by Choke, J., in 8 Edw. IV. 19 (and his opinion was approved in 5 Coke, 107), that where the sea ebbs and flows over land, when it flows, it is then parcel of the sea. And in Barber v. Wharton, 2 Ld. Raym. 1452, the court held, that a contract alleged to be made infra fluxum et refluxum maris, might be on the high sea, and was so, if the water was at high water mark. It should have been called, in accuracy of language, "the sea," because the "high sea." or "main sea." (altum mare, or le haut meer), properly begins at low water mark. 1 Bl. Comm. 110. And so is the unquestionable distinction of the admiralty. Exton, cc. 3–5, etc. Nor is this distinction unimportant. The statute of 13 Rich. II. c. 5, prohibits the admiral to meddle, except of things done on the sea ("sur le meer"), which includes the ebb and flow of the tide on the sea coast, and, as the admiralty contends, in ports and havens also; whereas Lord Coke, and the common lawyers, perpetually construe the exception of the statute, as though it were "high sea" (altum mare, le haut meer), and assert, "that where a place is covered over with salt water, and not of any county or town, there it is altum mare, but where it is within the county, it is not altum mare." Leigh v. Burley, Owen, 122; Sir Henry Constable's Case, 5 Coke, 106; 1 Hale, P. C. 424. In fact, what is "the sea," or the "high sea," has nothing to do with the bounds of counties, but is ascertained by high and low water mark, on the sea coast; and, by parity of reason, it should be the same in ports and havens. See

---

[22] This is probably a wrong citation, for there is no case at all applicable to the subject in the year book of that year.

[23] Lord Hale manifestly considers, that the mere circumstance, that the place is within the body of a county, does not exclude the admiralty jurisdiction, for, after speaking of the narrow sea, as being within the body of a county or without, he adds, that, in this sea, the king exercises his right of jurisdiction ordinarily by his admiral. De Port. Mar. c. 4.

Godfrey's Case, Latch, 11; Hale, De Port. c. 4, p. 10.

The third proposition is, that all ports and havens are within the bodies of the counties of the realm. By "ports and havens," as the words are here used, are meant, not merely port or haven towns, but all the tide waters included within the harbors and franchises. This proposition is attempted to be sustained as an inference from the prior propositions, and from the authorities already stated (Fitzh. Abr. "Avowry," 192; Id. Corone, 399; Id. Conisance, 36), which have been fully considered and answered. All the subsequent cases, from the earliest to the latest, profess to proceed upon these authorities, feeble and inconclusive, as they must be confessed to be.[24] Indeed, some of these cases are perfectly consistent with the claims of the admiralty (Noy, 148; Cro. Jac. 514; and 3 Term R. 315); for, since the statute 13 Rich. II. c. 5, it is admitted, that the admiralty has no jurisdiction in rivers, above the first bridges next to the sea, and the places on the Thames, mentioned in these Reports, would therefore be excluded.

The fourth proposition is, that where the common law hath jurisdiction, it excludes the admiralty; and the common law hath jurisdiction in ports and havens. This proposition also rests on the same authorities, as the preceding. Fitzh. Abr. "Avowry," 192; Conisance, 36; Corone, 399. It has been already shown, that the common law originally had jurisdiction on the high seas, concurrent with the admiralty; and the exercise of that jurisdiction would be just as conclusive against that of the admiralty on the high seas, as it is now assumed to be in ports and havens. It is certain, that the admiralty did anciently take cognizance of suits in ports, and, if the common law did the same, the only reasonable inference is, that the cognizance was concurrent. Zouch, 113; Hale, De Port. c. 7, p. 88. And it is hardly necessary to repeat, that the authorities relied on do not warrant any different doctrine. Indeed, it never was true, and is not now true, that the jurisdiction of the common law excluded that of the admiralty. In cases, now manifestly within the admiralty jurisdiction, the common law claims a concurrent cognizance, as will be abundantly shown hereafter.[25]

[24] Leigh v. Burley, Owen, 122; 2 Brownl. & G. 37; Violet v. Blague, Cro. Jac. 514; 2 Rolle, 49; Moore, 891; Willets v. Newport, 1 Rolle, 250; Dorrington's Case, Moore, 916; Trinity House v. Boreman, 2 Brownl. & G. 13; Butler v. Thayer, Id. 29; Goodwin v. Tomkins, Noy, 148; Tasker v. Gale, 1 Rolle, Abr. 533; 1, 19; Velthason v. Ormsley, 3 Term R. 315. The doctrine in Moore, 891, "that the coasts, shores, and harbors, are all out of the power of the admiral, except in the two cases allowed specially in St. 15 Rich. II," is not law; for it is clear, that on the sea coasts, as far as the tide flows, the admiralty hath jurisdiction, when the sea is full.

[25] Since the statute 28 Hen. VIII. c. 15, the courts of common law still claim concurrent jur-

In confirmation of the doctrine of the common law, which excludes the admiralty from cognizance of things done in ports and havens, the provisions of the statute of 2 Hen. V., c. 6, and 27 Eliz. c. 11, have been cited. The statute of Elizabeth provides, that such of the offences therein mentioned, as shall be done on the main sea, or coasts of the sea, being no part of the body of any county of the realm, and without the precincts, &c. of the cinqueports, shall be tried and determined before the lord high admiral, and other justices, of oyer and terminer, according to the form of the statute of 28 Hen. VIII., c. 15. And so, says Lord Coke (4 Inst. 137), by the judgment of the whole parliament, the jurisdiction of the lord admiral is wholly confined to the main sea, and coasts of the sea, being no parcel of any county of the realm. To this remark it has been very properly replied: 1. That the jurisdiction here conferred is not on the admiralty, but on the high commission court. 2. That several of the offences, stated in the statute, are such, as never were within the admiralty jurisdiction. The statute of 2 Hen. V. c. 6., commonly called the "Statute of Truces," gives power and authority to the conservators of truces, appointed by that act, "to inquire of all such treasons and offences against the truce and safe conducts upon the main sea ('sur le haut meere') out of the bodies of the counties, and out of the franchises of the cinqueports, as the admirals of the kings of England, before this time, reasonably, after the old custom and law on the sea ('sur le meer') used, have done or used;" and as to similar offences committed within the body of the counties, the conservator, and two commissioners joined with him, are to make inquisition. So far as this statute may have been argued to disprove the jurisdiction of the admiralty in ports, it admits of a decisive answer. 1. That the jurisdiction is special, and no more disproves the admiralty jurisdiction in ports, than on the high seas; or than that of the common law over offences against truces committed on land. 2. That, by this statute, the breaking of truces is declared treason, and is punishable, in the manner stated in the statute, by a special court; but it cannot, by implication, oust either the common law or admiralty of its jurisdiction over any other offences. 3. That if the argument could prevail, it would oust the jurisdiction of the admiralty over homicides and mayhems committed in great rivers beneath the first bridges, which has never been pretended.

Indeed, the argument derived from the collateral provisions of statutes, is generally unsatisfactory, and rarely conclusive; and if there be any weight in the present one, as an exposition of the true jurisdiction of the admiralty since the statutes of Richard II., it is completely counterpoised by other statutes.

isdiction of the offences stated in that statute, committed in creeks and arms of the sea. 2 Hale, P. C. 18–54.

·The statute 28 Hen. VIII. c. 15, gives the high, commission court (created by that act, and of which the admiral is the chief judge) jurisdiction of all "treasons, felonies, murders, and confederacies, thereafter to be committed in or upon the sea, or in any other haven, river, creek, or place, where the admiral or admirals have, or pretended to have power, authority, or jurisdiction." And it has been argued, that this is a complete recognition of the admiralty jurisdiction in all ports and havens. Lord Coke has attempted to evade the force of the argument, by assuming, that the words, "or pretend to have," &c. are to be understood between the high water mark and low water mark; for though the land, at the reflow be within the county, yet when the sea is full, the admiralty has also jurisdiction as low as the sea flows; but, that the words extend not to any haven, river, creek, or place, that is within the body of the county. See Leigh v. Burley, Owen, 122; 3 Inst. 113. This construction is perfectly gratuitous, and is unsupported by the words of the statute. There never was any question, that the admiral had jurisdiction within the ebb and flow of the tide on the sea coast. The only controversy, at the time of passing the statute, was, whether he had jurisdiction in ports and havens, and it is certain that he always did "pretend to have" jurisdiction there. And the statute, so far from negativing this claim declares, in the alternative, that he has, or pretends to have, the jurisdiction. Lord Hale, in commenting on this passage in the statute (2 Hale, P. C. 16), says, "This seems to me to extend to great rivers, where the sea flows and reflows, below the first bridges, and also in creeks of the sea, at full water, where the sea flows and reflows, and upon high water upon the shore, though these, possibly, be within the body of the county; for there, at least, by the statute 15 Rich. II., they (the admirals) have a jurisdiction; and thus, accordingly it hath been constantly used at all times, even when the judges of the common law have been named in the commission; but we are not to extend the words 'pretend to have,' to such a pretence, as is without any right at all, and, therefore, although the admiral pretend to have jurisdiction upon the shore, when the water is reflowed, yet he hath no cognizance of a felony committed there." And in Lacy's Case (2 Hale, P. C. 19, 1 Leon. 270; and Moore, 121. And see Owen, 122) an indictment before the high commission court was held good for a murder committed at Scarborough sands, though it was alleged to be done "within the ebb and flow of the tide in Scarborough, and to be parcel of the port of Scarborough," and, as some of the reports show, expressly upon the ground that the jurisdiction of the high commission court extended to such places.[26] And, it may be add-

ed in confirmation, that the commissions, issued upon this statute, have uniformly authorized inquisitions of all felonies, "super mari, vel aliquo rivo, portu, aqua dulci, creca, seu loco quocunque infra fluxum maris ad plenitudinem maris a quibuscunque primis pontibus versus mare et super littus maris, etc. secundum stylum et consuetudinem regni Angliae et curiae admiralitatis."[27] And the judicial writs, issued by the high commission court, from time to time (Exton, c. 17, p. 245. etc.), and the statute of 11 & 12 Wm. III. c. 7, in pari materia, seem to put this construction beyond all question. The statute of 28 Hen. VIII. does, therefore, warrant a strong inference, that, at the time of its passage, it was understood as law, that the admiralty had jurisdiction upon tide waters, in ports, havens, and creeks of the sea. And Lord Hale's exposition of this statute, and his affirmation of the admiralty jurisdiction in these places, in contradiction to Lord Coke, has been very recently and solemnly recognised by the twelve judges of England, and sentence of death passed in pursuance of that opinion. Bruce's Case (1812) 2 Leach, Cr. Cas. (4th Ed.) 1093. See, also, Coombe's Case, 1 Leach, Cr. Cas. 388.

It may be well, in this connexion, to take notice of another doctrine of the common law, viz. that where an act is done partly upon the land and partly upon the sea, the admiralty is excluded. Hence it is said, that if a ship be taken at sea, and carried to a port within the body of a county, the admiralty loses its jurisdiction. 4 Inst. 140; 12 Coke, 79. It is difficult to comprehend what an act is, that can be done partly on the sea and partly on the land; and still more difficult to perceive, how the bringing the

<hr>

[26] 1 Leon, 270; Moore, 121. Lord Hale's explanation of this judgment (2 Hale, P. C. 20) does not seem to comport with the grounds of

the decision, as stated in Leonard and Moore. In both reports, the case is put upon the point, that it was within the jurisdiction of the high commission court, under statute 28 Hen. VIII., and not (as Lord Hale supposes) the death being on land, by virtue of any common law commission. In the report in Moore, 121, the following additional opinion is imputed to the court, that "by the statute 13 Rich. II., c. 5, the admiral himself is prohibited to intermeddle with any thing within the body of the county, as all havens are, and, on that account, havens are not within the admiralty; yet all the land, upon which the water of the sea flows and reflows, is within the jurisdiction of the admiralty." This remark, in its obvious purport, seems to recognise the doctrine of the admiralty, that it has not jurisdiction in ports and havens, as such, and over the ports and haven towns, but only so far in the ports, &c. as the sea flows; and, if this be the true meaning, it seems to coincide with that avowed by Lord Hale. 2 Hale, P. C. 17.

[27] 2 Hale, P. C. 18. The words of the commission are given somewhat differently by Zouch, 112. The jurisdiction is thus described: "Tam in aut super mari aut aliquo portu, rivo, aqua dulci, creca seu loco quocunque, infra fluxum maris ad plenitudinem, a quibuscunque primis pontibus versus mare, quam super littus maris et alibi ubicunque infra jurisdictionem nostram maritimam aut limites admiralitatis regni nostri et dominiorum nostrorum." And see Zouch, 93, and 2 East, P. C. 795, and Sir L. Jenkins' Charge, 91, 92.

property infra praesidia, (if I may so say) can deprive the admiralty of its jurisdiction. The corpus delicti still remains, and, until the property is so brought within the power of the court, it would seem impracticable to exercise any jurisdiction at all; and it would be strange, indeed, if the only circumstance, which would render the jurisdiction effectual, should take it away. The statute 13 Rich. II. c. 5, allows the admiralty cognizance of things done upon the sea, and yet, upon this construction, it would be entirely lost or useless. It is utterly impossible to support such an opinion; and, accordingly, it has been in other cases qualified or abandoned. 1 Rolle, Abr. 533, 1, 13. Other distinctions, however, have sprung up in its room, to defeat the claims of the admiralty. It has been held, that if the tort be done at sea, and afterwards the property be changed by a sale on land; or, if the tort be not one continuing act, but be severed by the intervention of new parties, the jurisdiction of the admiralty is gone. Spanish Ambassadour v. Jolliff, Hob. 78; Com. Dig. "Admiralty" F, 5; 2 Brown, Adm. 118. These distinctions have, in their turn, been denied, and, after a very severe and doubtful conflict, the reasonable doctrine seems now established, that, where the tort is done at sea, the jurisdiction of the admiralty is not defeated by any subsequent transaction on land, or by any concurrent jurisdiction of the common law. 1 Vent. 308; Radly v. Eglesfield, Id. 173, 2 Saund. 259; Cro. Eliz. 685; 1 Rolle, Abr. 530, 1, 40; Com. Dig. "Admiralty" F, 5, 6. And, it may be added, that this is the unquestionable doctrine in the United States. Rose v. Himely, 4 Cranch [8 U. S.] 241.

We have now considered the principal, if not all the reasons, which the courts of common law have advanced, to exclude the admiralty from jurisdiction in ports and havens.

On the other hand, the admiralty has strenuously contended, that the statutes of Richard II. never intended to deny the jurisdiction in ports and havens, within the ebb and flow of the tide, and in great streams beneath the first bridges. It fortifies its pretensions by the consideration, that such was its undoubted jurisdiction in the reign of Edward III., to which the statute of 13 Rich. II. c. 5, appeals for a determination of its authority; that this is the only statute, speaking affirmatively in respect to the admiralty jurisdiction, declaring it to extend to things done upon the sea; and that the sea (which includes all waters as far as the tide flows) never was within the body of any county; that long after the statutes of Richard II., the admiralty continued to exercise jurisdiction in ports and havens (Exton, c. 17, p. 255); that it was recognised by the courts of common law upon writs of procedendo and consultation, in the reigns of Henry VIII. and Elizabeth (Exton, cc. 3, 10–13, 17–20, pp. 80–276), by acts of parliament, and especially by St. 28 Hen. VIII. c. 15; 32 Hen. VIII. c. 14; and 1 Eliz. c. 17 (Exton, c. 5, p. 104; Id. c. 20, p. 270; Zouch, 112); that it is confirmed by the forms of the commissions of the lord high admiral, which, notwithstanding the statutes of Richard, have, for ages since, continued to include jurisdiction in ports and havens, and rivers beneath the first bridges (Zouch, 92); and, finally, that it seems admitted in 1632, by the concurrent opinion of all the twelve judges.[28] These pretensions, too, have been deliberately adopted by Sir H. Spelman; for he says (Spel. Reliq. Adm. Jur. 226), "The place absolutely subject to the jurisdiction of the admiralty is the sea, which seemeth to comprehend public rivers, fresh waters, creeks, and surrounded places whatsoever, within the ebbing and flowing of the sea at the highest water, the shore or banks adjoining, from all the first bridges seaward." Lord Hale seems to admit the same doctrine (2 Hale, P. C. 16; Hale, De Port. c. 7, p. 88); and it has been solemnly recognized and enforced (as we shall hereafter see) by the congress and the supreme court of the United States.[29]

We are next led to the consideration of the jurisdiction of the admiralty over contracts. And here it is held by the courts of common law, that the jurisdiction is confined to contracts made upon the high sea, to be executed upon the high sea, of matters in their own nature maritime. These restrictions purport to be founded upon the construction of the statutes of Richard II., and more especially on that of 15 Rich. II. c. 3. There is, as we have already seen, no authority for them in any anterior reign; and it is certain, that before Richard's time the admiralty did openly assert and exercise jurisdiction over maritime contracts. The statute of 13 Rich. II. c. 5, is the only one, which (as has been already stated) speaks in affirmance of the admiralty jurisdiction, and it allows it of "things done upon the sea." It is difficult, looking to the obvious intent of this statute, as explained in the preamble, and more fully in the petition, to which it was a response (Exton, 289, 290, etc.), to believe, that it meant to abridge the jurisdiction then claimed by the admiralty, except as to things on land within the ports of the realm. It meant to check its usurpations, and not to narrow its ancient rightful authority. And as to cases without the mischiefs of the statute, as contracts beyond seas, on which the com-

[28] "Likewise, the admiral may inquire of, and redress all annoyances and obstructions, in all navigable rivers beneath the first bridges, that are impediments to navigation, or passage to or from the sea, and, also, to try personal contracts and injuries there, which concern navigation on the sea." Exton, 404; Zouch, 122; Agreement in 1632.

[29] In Godfrey's Case, Latch, 11, the opinion of Doddridge, J., seems to assert, that the sea extends to tide waters in ports, for, when he speaks of a contract made on board of a ship at anchor, and says it is then made on the sea, he probably means at anchor in port.

mon law would then afford no remedy, and disclaimed jurisdiction, there was no reason to extend the meaning of the enacting clause, so as to embrace them. And such for some time was the construction adopted in practice. Tucker v. Cappes, 2 Rolle, 497. The words, however, are not "things done upon the sea" absolutely, but according to the usage in the time of Edward the Third. And we have seen that, at that time, the sea comprehended the waters in ports, as far as the flood tide extended; and that maritime contracts were enforced in the admiralty. The true interpretation then of the words "things done upon the sea," in this connexion, would seem to be all things done touching the sea, i. e. maritime affairs in general; and this is the approved interpretation asserted by the admiralty. Zouch, 103; Exton, 321. Nor let it be deemed a strained or unnatural construction of the words. It is adopted by Selden in respect to similar expressions in an ordinance respecting the jurisdiction of the admiralty of France. The ordinance uses this phrase, "pour raison ou occasion de faict de la mer."[30] "Id est (says Selden) ob causam aliquam a re maritimâ ortam." Seld. de Dom. Mar. lib. 2, c. 18, p. 169. Valin, too, recites several ordinances of France respecting the jurisdiction of the admiralty, and particularly one about this very period (Ordinance of 1400) which gives (article 3) "connoissance et jurisdiction de tous les faits de la mer, et des dependences criminellement et civilement;" and again (article 20) "de choses dependants de la mer," which expressions he does not scruple to declare as a grant of jurisdiction over all maritime contracts. He adds, that the judges of the admiralty have always of right, from the very nature and object of their institution, possessed cognizance of them; and this, not only as to contracts then in use, but as to all other contracts of a maritime nature. 1 Valin, Comm. 124. Valin, therefore, affords a distinct authority in favor of this exposition of the words of the statute, for there is no substantial distinction between "choses faits sur la mer" and "faits de la mer;" and this too in a similar controversy as to jurisdiction between the rival courts of France, contested with as much zeal, as it has been in England. But if we waive this interpretation, which rests on the reference to the usage in the time of Edward III., and if we reject this reference altogether (which in common reason we are not at liberty to do), still, in the most literal and rigid sense of the terms, "things done upon the sea," the admiralty must have jurisdiction in all cases of maritime service and labor, for these are strictly done upon the sea. And whether the contract or engagement be made at land or not is immaterial, since the service is actually performed upon the sea, and the jurisdiction

[30] The words of the statute of Rich. II. are "choses faits sur la mer."

attaching to the service, the other things are but incidents. We shall presently see, how far the common law courts have adopted this, or any other consistent construction of the statute.

Let us now recur to that, which should principally engage our attention, viz. the statute of 15 Rich. II. c. 3. It prohibits the admiralty from taking cognizance of "all manner of contracts, pleas and quereles, and all other things, done or arising within the bodies of counties, as well by land as by water." The whole question, as to the extent of this, prohibition, turns upon the legal meaning of the words "contracts, pleas and quereles arising within the bodies of counties," for no particular stress can be laid upon the word "done," as in every fair construction it must refer to its next antecedent, "other things." In respect to "quereles," if by this word be meant torts or injuries in rem, or in personam, the jurisdiction would seem limited to the place where the act is done, for there it may be said properly to arise. If "complaints or controversies" be meant (as would seem to be the critical sense), the place where they arise must depend upon the subject matter; if torts or injuries in rem, they arise, where the acts are done; if contracts or personal rights, they arise where the performance or breach of performance, or other invasion of right, takes place. The same observation applies to "pleas" or actions, for "ex facto jus oritur, et actio oritur ex delicto." In a more enlarged sense, "controversies, pleas and actions" arise, where the law has appointed the forum competent to try them. Such are the forum rei sitae, the forum domicilii, the forum maleficii, &c. which depend upon the municipal regulations of each particular country. See Pothier's Pandects, lib. 5, tit. 1, § 35, etc. In respect to "contracts," these may be said to arise, where they originate or are made, or, with equal propriety, where they are to be executed or performed. So it is laid down in the civil law, "Contraxisse unusquisque in eo loco intelligitur, in quo ut solveret se obligavit" (Dig. lib. 44, tit. 7, l. 21; 2 Emer. 331); "Contractum autem non utique eo loco intelligitur, quo negotium gestum sit, sed quo solvenda est pecunia" (Dig. lib. 42, tit. 5, l. 3; Exton, 323; Hein. Element. Pandect. pars. 2, § 36). Huberus (De Foro Compet. § 53) asserts the same doctrine; "Non eum esse locum contractus semper, ubi negotium inter partes celebratum, sed ad quem contrahentes respexerunt." The common law has adopted the same doctrine, for it construes a contract by the law of the place, where it is to be performed or executed, and not simply the place of its origin. And it now sustains actions in its own courts upon foreign contracts, solely upon the ground, that such contracts are not local, but exist or arise in every place, where the debtor is found. It proceeds yet further, and takes cognizance of torts and injuries to persons and property without the realm, both

upon the high seas and in foreign countries, upon the ground that they are not local, but arise wherever the party resides. And in this respect it seems to have adopted the doctrines of the civilians. Hub. de Foro Compet. p. 731, § 57. It is utterly impossible to reconcile the decisions of the courts of common law with the construction of the statute of 15 Rich. II. c. 3, here stated, or indeed with any other construction warranted by the words of the statute or by consistent principles of interpretation.

Let us now proceed to consider these various decisions. And, in the first place, it is held, that the admiralty has no jurisdiction over matters done upon land in foreign parts. 4 Inst. 134, 139. It ought to be observed, that the admiralty never did claim, as of right, the cognizance of torts or injuries in rem or in personam in foreign countries, nor of contracts made there, which were not of a maritime nature. It may sometimes have entertained suits of a different kind; but the limit, which upon principle it has prescribed to itself, has been to decline all jurisdiction except of foreign maritime contracts.[31] The principal ground, upon which the common law proceeds to enforce this restriction, is that by the statute of 13 Richard II. c. 5, the admiralty is confined to things done upon the sea. It has been already submitted, that this is not a necessary construction, for the principal object of that statute was to prevent the admiralty from intermeddling with things done within the realm, and that it did not mean to abridge its ancient rightful jurisdiction, but left it as it was in the time of Edward III. It is incontrovertible, that at that period the admiralty had cognizance of foreign maritime contracts, for in the ordinance of Edward I. at Hastings (already quoted), it is given in express terms. Clerke, Prax. 143, 144. So reasonable did it in fact appear to allow this jurisdiction as to foreign contracts, that there is a string of adjudications each way. In De la Broche v. Barney (31 Eliz.) 3 Leon. 232, upon a suit in the admiralty, upon an obligation supposed to be made and delivered in France, the whole court held in effect, that the admiralty had a concurrent jurisdiction with the common law over foreign contracts. This doctrine was affirmed in Furnes v. Smith (11 Car.) 6 Vin. Abr. p. 517, pl. 3; 1 Rolle, Abr. 530, 1, 39. And see Spanish Ambassadour v. Plage, Moore, 814; and Slany v. Cotton, 2 Rolle, 486. And notwithstanding divers intermediate contrary cases (Tomlinson's Case, 12 Coke, 104; 4 Inst. 139; Palmer v. Pope, Hob. 79, 212; Bridgman's Case, Id. 11, Moore, 918; Anon., 2 Brownl. & G. 16; Jennings v. Audley, Id. 30; Hob. 79, 213; Tourson v. Tour-

son, 1 Rolle, 80; S. P., 2 Brownl. & G. 34), it was again, after solemn debate, deliberately held in Tucker v. Cappes, 2 Rolle, 492, 497; it was conceded in the agreements of the judges in 1575, and of the twelve judges in 1632;[32] it was again debated in Cremer v. Tookley, Godb. 385; Latch, 188; and, finally, in the last cases reported in the books, was denied, and the point of jurisdiction adjudged against the admiralty (Ball v. Trelawny, Cro. Car. 603; Jurado v. Gregory, 1 Vent. 32; 1 Lev. 267; 2 Keb. 511). In this conflict of opinion, it may not be unfit to entertain such a doctrine, as comports best with the principles, which ought to regulate the subject. Considering then, that the admiralty from the highest antiquity had this jurisdiction; that it was the only court, which, as the law was then understood, could enforce foreign contracts; that the statute of Richard was made on a special occasion, to check the encroachments of the admiralty; that the language of that statute, "choses faits sur la mer," may well admit the interpretation asserted by the admiralty, viz. such things as are of a maritime nature, and more especially, as that was the rightful usage of the admiralty in the reign of Edward III., which is incorporated into the very exception of the statute; considering also that the admiralty continued to exercise that authority for two centuries after the passage of the statute, and that there is a great weight of common law authority in its favor, it does not seem unfit to hold, that the admiralty has cognizance of all foreign maritime contracts. There is this additional circumstance of great importance, that it is the only construction, upon which whole classes of cases, still acknowledged to be within the admiralty jurisdiction, can be sustained or reconciled with principle. I allude to the right to entertain suits, 1. To enforce the judgments of foreign admiralty courts. 2. To proceed in rem upon bottomry bonds executed in foreign parts. In neither case can

---

[31] Upon this ground, the cases of Spanish Ambassadour v. Points, 2 Bulst. 322, 1 Rolle, 133; Don Alonso v. Cornero, Hob. 212, 2 Brownl. & G. 29; and Empringham's Case, 12 Coke, 84,—may, consistently with the rightful claims of the admiralty, be held good law.

[32] In the agreement of 1575, it stands thus: "That the judge of the admiralty, according to such ancient order, as hath been taken by King Edward I. and his council, and according to the letters patent of the lord high admiral for the time being, and allowed by other kings of the land ever since, and by custom time out of memory of man, may have and enjoy cognition of all contracts and other things, rising as well beyond as upon the sea, without let or prohibition." In the agreement of 1632, it stands thus: "If suit be commenced in the court of admiralty upon contracts made, or other things personally done, beyond or upon seas, no prohibition is to be awarded." Zouch, 121, 122; Exton, 443. So much, indeed, was the right to entertain suits upon foreign maritime contracts deemed as of course in the admiralty, that in Clerke, Prax. tit. 41, the mode of proceeding is pointed out without any intimation of doubt. "Aliquando etiam factor, vel negotiorum tuorum gestor in partibus transmarinis, signavit tibi quaedam bona ad tuum usum vel commodum, alius tamen ea detinet, vel injuste occupat, in his casibus obtinere potes warrantum," &c. &c.

there be the slightest pretence, that the things are "done upon the sea," or "arise upon the sea," in the sense affixed to these terms by the common lawyers. Yet in both these cases the authority of the admiralty has been admitted in the most ample manner (Com. Dig. "Admiralty," E, 10, 17), and in a recent case of bottomry triumphantly upheld against every objection (Menetone v. Gibbons, 3 Term R. 267). These melancholy remains of its former splendor stand upon the ancient foundations of the admiralty before the reign of Richard II., and if they have survived the assaults of enmity and time, it is because the principles, on which they rest, are solid and immovable.[33] In the second place, it is held that the admiralty has no jurisdiction, where the contract is made at sea to be executed upon land. One reason of this is said to be, that in such cases the courts of common law may entertain suits, and where they can, they exclude all other courts. 4 Inst. 142; Anon., 2 Brownl. & G. 16; Thomlinson's Case, 12 Coke, 104; Tucker v. Cappes, 2 Rolle, 492, 497; Com. Dig. "Admiralty," F, 5, 6; Hale, Hist. Com. Law, 31; 3 Bl. Comm. 106.

The doctrine, that the admiralty is ousted by a concurrent jurisdiction of the common law, would, if true, completely destroy its authority in all cases, except of prize; for, in all others, the common law has now acquired or claimed a concurrent jurisdiction. It cannot, therefore, be maintained. There would be a much stronger reason for contending, upon sound principles, that, where the admiralty possessed jurisdiction, the common law ought to be excluded. As little foundation is there for the suggestion, that this is a proper construction of the statute of 15 Rich. II., c. 3. Contracts made at sea certainly "arise" there in the sense of the term assumed by the common law, and the admiralty jurisdiction ought therefore to attach. And so the court, in an anonymous case in Cro. Eliz. 685, held, and said, that when the original cause ariseth upon the sea, and other matters happen upon the land depending upon the original cause, those matters, although done upon land, shall be tried in the admiralty; and this decision was approved in a still later case.[34] Nevertheless, against

the words of the statute and the reason of the thing, the courts of common law have not hesitated to disavow this at least consistent doctrine. It is in the next place held, that if a contract be made at sea upon a subject not maritime, or be under seal, or be afterwards sealed upon land, the admiralty has no jurisdiction. Bridgman's Case, Hob. 11, Moore, 918; Palmer v. Pope, Hob. 79, 212; 3 Salk. 23. Consistently with the interpretation put upon the statutes of Richard II., by the common law, these distinctions ought not to prevail, for the contracts "arise" upon the sea, and are "things done upon the sea;" and there is not a word in the statutes annexing any qualification, as to the nature, objects or form, of the things done upon the sea. And so is the opinion held by Lord Holt in Collins v. Jessot, 6 Mod. 155, where he asserts, that the admiralty has jurisdiction in respect to the locality of the cause of action, let the nature of the action be what it will. The doctrine, however, which we are now considering, abandons this test of jurisdiction, and so far as it regards the nature of the contract, maritime or not, rests wholly upon the exposition of the statute asserted by the admiralty; and is inadmissible in every other view. As to the effect of a seal in ousting the jurisdiction, we shall have occasion more fully to consider it hereafter.

Another and leading principle, asserted at common law, is, that the admiralty hath no jurisdiction, though the thing be done or happen at sea, if the original of the act was upon land. Hence, it is held, if a contract be made at land for any maritime business or thing, to be performed upon or beyond the seas, and there be a breach upon or beyond the seas, the cognizance belongs exclusively to the common law. This, it is said, is a necessary result from legal principles, for the contract and breach are both requisite to maintain an action, and as both are not "done or made upon the sea," the admiralty cannot claim any jurisdiction. It would be a waste of time to go over the different cases in the books, in which, upon this ground, prohibitions have been granted on account of suits in the admiralty on charter parties, affreightments, and other maritime contracts. With a few exceptions they are ranged on one side, and in general state the decision without condescending to illustrate it by any reasons or argument. 4 Inst. 134, 138, 139; Anon., Moore, 450; Bylota v. Pointel, Dyer, 159; Bend. & D. 58; Johnson v. Drake, 1

---

[33] One argument, and indeed a principal one, urged by Lord Coke against the admiralty jurisdiction over foreign contracts, is, that they are cognizable by the court of the lord constable and marshal, commonly called the "Court of Chivalry." This argument is a full illustration of Mr. Justice Buller's remarks on Lord Coke's (4 Inst. 134), respecting the admiralty. By the statute of 13 Rich. II. c. 2, the jurisdiction of the court of the lord constable and marshal is expressly limited to conusance "of contracts and deeds of arms and of war out of the realm, and also of things which touch war within the realm." Hence it is very clear, that it has cognizance of such contracts only as touch deeds of arms and war (Zouch. 119; 2 Hale, P. C. 33; 3 Bl. Comm. 68); and consequently its jurisdiction over all other foreign contracts is excluded.

[34] Spark v. Stafford. Hard. 183. In this case, there was a suit in the admiralty by the mas-

ter of a ship against the owner, to recover the amount of a ransom for the ship, which was taken at sea by pirates, and the ransom money was paid by the master on land. Of course the suit was upon an implied contract of the owner arising from a payment on land for his benefit. The court denied a prohibition, "because the original cause of action arose upon the sea, and whatever followed was but accessary and consequential, and therefore well determinable in the court of admiralty." See, also, Godfrey's Case, Latch, 11.

Keb. 176; Merryweather v. Mountford, 3 Keb. 552; Fleminge v. Yate, 1 Rolle, 410, 3 Bulst. 205; Cappes' Case, 2 Rolle, 492, 497; Slany v. Cotton, Id. 486; Cradock's Case, 2 Brownl. & G. 37; Leigh v. Burley, Owen, 122; Spanish Ambassadour v. Jolliff, Hob. 78; Hawkeridge's Case, 12 Coke, 129; Hoare v. Clement, 2 Show. 338; Burton v. Fitzgerald, 2 Strange, 1078; Justin v. Ballam, 1 Salk. 34; 6 Vin. Abr. p. 526, pl. 15, 16. This doctrine affects to be founded upon a strict construction of the statutes of Richard II., because the contract "arises" on land. It is curious to observe the inconsistencies of the common law courts on this subject. In the first place, the admiralty has no jurisdiction of contracts made at sea to be executed upon land, because, though the contracts arise at sea, yet the performance, which is the principal thing, is to be on land. In the second place, the admiralty has no jurisdiction of contracts made on land to be executed at sea, because the contracts arise on land, and the performance at sea, though a principal thing, ought not to oust the common law, whose jurisdiction attached upon the contracts. Upon what principle is it, that the common law assumes jurisdiction in the one case or the other? Where the breach or the performance of the contract is upon or beyond the seas, no foreign venue can be laid, and no jury can come to try the issue joined upon such fact. And for this reason, as we have seen, the courts of common law formerly declined jurisdiction of such causes, because done without the realm. Besides, whatever may be the place of the contract the action, plea or querele "arises" from the subsequent facts done upon the seas, "a fine omnis oritur actio;" and of the action, plea, or querele, the admiralty ought, at all events, to have cognizance. The proper jurisdiction of the courts of common law is of things done within the bodies of counties, and its further enlargement, by means of fictions, can be considered only as ingenious subterfuges and devices, to amplify their powers. The only ground of principle, upon which these courts can stand on this point, must be, that the cognizance of any one matter of fact within the county draws after it the cognizance of all others, as incidents to the exercise of this right (Tremoulin v. Sands, Comb. 462; 4 Inst. 142; Co. Litt. 261); and in this view, that it is perfectly immaterial, whether the jurisdiction vest by the making, the performance, or the breach, of the contract within the county; or that personal contracts, pleas and actions, have no locality, and "arise," and may (as the civilians hold) be enforced, wherever the party or his property is found. In either view, the same reasoning must apply equally to the admiralty and entitle it to all the jurisdiction, which it has ever claimed as of right. Zouch, 104. And in respect to mariners' wages, Lord Mansfield (Howe v. Nappier, 4 Burrows. 1944) evidently adopts the former construction, as

indeed it had been held before (Coke v. Cretchet, 3 Lev. 60). He says, "There (i. e. in cases of wages) the contract is only a memorandum fixing the rate, and ascertaining the wages, but the service at sea is the principal matter in consideration. The gist and foundation of the action (in the admiralty) is the marine service." See 3 Bl. Comm. 106; Abb. Shipp. pt. 4, c. 4, § 1. And why, in the case of a charter party, bill of lading, or other maritime contract, is the doctrine less true? The service or other act is at sea, and the gist or foundation of the action is the marine transportation or other service, neglect or injury, and the contract is but collateral to the action. Molloy, bk. 2, c. 2, §§ 2, 13; 1 Hagg. Adm. 226; This principle was forcibly pressed by Noy in the interesting case of Tucker v. Cappes, 2 Rolle, 497, and was in part adopted by the court. It was in effect held by Mallet, J., in Woodward v. Bonithan, T. Raym. 3, and was solemnly supported and adjudged in Coke v. Cretchet, 3 Lev. 60. See 2 Brown. Adm. 86.

Much, indeed, that might be properly urged on this head, has been anticipated in another place. It has been already shown; 1. that in reason and law a contract may be said to "arise," as well where it is executed, as where it is made; 2. that contracts made at land, to be executed at sea, were originally within the admiralty jurisdiction; 3. that contracts, pleas and quereles, whereof part of the facts arise on land, and part at sea, may well support a concurrent jurisdiction of the common law and the admiralty, since, in respect to each, a principal matter arises within its cognizance; and 4. that this construction is consistent with the words of the statutes of Richard II., and avoids all the incongruities of the decisions of the common law. These doctrines are yet further supported by authority. By the statute of 32 Hen. VIII., c. 14, cognizance was expressly given to the admiralty over charter parties and affreightments within the purview of that act. Zouch, 106; Prynne's Animad. 121, 122. In the agreement of the judges in 1575, and again in that of the twelve judges in 1632, the admiralty jurisdiction in these cases is admitted in the most ample and explicit manner.[35] To the

<hr/>

[35] The clause in the agreement of 1575 has been already quoted. In that of 1632 are the following: "If suit be before the admiral for freight or mariners' wages, or for the breach of charter-parties for voyages to be made beyond the seas, though the charter-parties happen to be made within the realm; and though the money be payable within the realm, so as the penalty be not demanded; a prohibition is not to be granted. But if suits be for the penalty, or if the question be made, whether the charter-party be made or not, or whether the plaintiff did release or otherwise discharge the same within the realm, that is to be tried in the king's court at Westminster, and not in the king's court of admiralty, so that first it be denied upon oath, that the charter-party was made, or a denial upon oath tendered." "If suit shall be in the court of admiralty for building, amending, saving, or necessary victualling, of a ship.

former agreement Lord Coke has made some objections, which are not probably well founded (4 Inst. 135); but to the latter no objections can apply, unless we are to deem the opinions of a single judge, or a single court, of more weight than the opinions of the twelve judges,[36] delivered after solemn debate and deliberation before the king's council, upon this very contest as to jurisdiction, and designed to deliver the subject from the endless controversies, to which it seemed doomed by the shifting adjudications of the rival courts. See 2 Brown, Adm. 77. The ordinance too of parliament, made during the commonwealth, (in 1648) completely confirms this jurisdiction in its full extent.[37]

Nor do these authorities stand alone. They are corroborated by the early practice of the admiralty, immediately after the passage of the statutes of Richard; by the recognition of that practice in the courts of chancery and common law, in granting commissions of appeal and writs of procedendo and consulta-

against the ship itself and not against any party by name, but such as for his interest makes himself a party, no prohibition shall be granted, though this be done within the realm." If it were pertinent we could here explain the restrictions in these causes, but it would occupy too much time.

[36] They are at least of as great weight, as the resolutions of the judges on a like occasion in the Articuli Cleri (3 Jac.), which, though not enacted in parliament, nor adjudged in any cause pending in court, Lord Coke himself declares, "being resolved unanimously by all the judges of England and barons of the exchequer, are for matters of law of the highest authority, next unto the court of parliament." 2 Inst. 618. Sir Leoline Jenkins has remarked, that the agreement of the judges in 1632, "was punctually observed, as to the granting and denying of prohibitions, till the late disorderly times (meaning the times of the usurpation) bore it down, as an act of prerogative, prejudicial (as was pretended) to the common laws and the liberty of the subject." And the same articles were, in substance, re-enacted in the ordinance of parliament, in 1648, given in the next note. Sir L. Jenkins' Works, Argumt. etc., p. 81.

[37] This ordinance is given at large from Scobell's Collection (147) in Mr. Hall's valuable translation of Clerke, Prax. 24. The first section, after reciting the public inconvenience to trade through "the uncertainty of the jurisdiction in maritime cases," enacts "that the court of admiralty shall have cognizance and jurisdiction against the ship or vessel with the tackle, apparel, and furniture thereof, in all causes which concern the repairing, victualling, and furnishing provisions, for the setting of such ships or vessels to sea; and in all cases of bottomry, and likewise in contracts made beyond the seas concerning shipping or navigation, or damages happening thereon, or arising at sea in any voyage; and likewise in all cases of charter-parties, or contracts for freight, bills of lading, or mariners' wages, or damages in goods laden on board ships, or other damages done by one ship or vessel to another, or by anchors or want of laying of buoys, except always that the said court of admiralty shall not hold pleas or admit actions upon any bills of exchange, or accounts betwixt merchant and merchant or their factors." This ordinance was made perpetual by another in 1654, but it fell with the other acts of the commonwealth upon the restoration of Charles II.

tion in the respective reigns of Richard II., Henry IV., Henry VIII., Elizabeth, James I., and Charles I. (Exton, cc. 7–9, pp. 338–394; Spanish Ambassadour v. Plage, Moore, 814); by subsequent common law decisions scattered in the reports (Tasker v. Gale, 6 Vin. Abr. p. 527, pl. 19, 21. And see Godfrey's Case, Latch, 11; Smith v. Tilly, 1 Keb. 712); and lastly, by the uniform language of the commissions of the lord high admiral, granted since the statutes of Richard II., which confer the most ample jurisdiction over all maritime contracts.[38]

There is also an exception to the doctrine, which we have been considering, (viz. that the admiralty hath no jurisdiction, where the contract is made at land, although to be executed at sea) which is wholly irreconcilable with the construction attempted to be given by the common lawyers to the statutes of Richard II., and with every general principle, for which they contend. I allude to the acknowledged right of the admiralty to entertain suits for mariners' wages. The history of this exception is highly instructive; and cannot be studied with too much attention by those, who are in search of the true exposition of the statutes of Richard II., and the rightful jurisdiction of the admiralty.

It was at first held, that the admiralty had no jurisdiction over mariners' wages, because the contract was made on land. Dyer, p. 159, note 38. And the earliest case in the Reports, in which the jurisdiction was affirmed, is in the 19th year of James I. Anon., Winch. 8. A prohibition was there prayed for and denied, "because he did not sue his prohibition in due time, viz. before a judgment given in the admiralty court, which in point of discretion they disallowed; and also these are poor mariners, and may not be delayed of their wages so long, and, besides, they may all join in a libel in the

[38] Zouch (92) has given a copy of the important clauses of one of those commissions. It authorizes the admiralty "to hold conusance of pleas, debts, bills of exchange, policies of assurance, accounts, charter parties, contractions, bills of lading, and all other contracts which may any ways concern moneys due for freight of ships hired and let to hire, moneys lent to be paid beyond the seas at the hazard of the lender, and also of any cause, business or injury whatsoever had or done in or upon or through the seas, or public rivers or fresh waters, streams, havens, and places subject to overflowing whatsoever within the flowing and ebbing of the sea, upon the shores or banks whatsoever adjoining to them or either of them from any of the said first bridges whatsoever towards the sea throughout our kingdoms of England and Ireland, in our dominions aforesaid, or elsewhere beyond the seas, or in any ports beyond the seas whatsoever." And see collection of sea laws (chapter 2, Malyne, Lex. Merc. p. 47). The clause in this commission, as to jurisdiction on the shores, would seem to refer to the meaning of the word "maritime," as stated in Hawkeridge's Case, 12 Coke, 129, where it is said that "maritima est super littus, or in portu maris." Even Lord Hale felt himself bound to admit the antiquity of these claims of the admiralty, while he endeavored to evade the force of the argument. Justice v. Brown, Hard. 473.

admiral's court, but, if they sue here, they must bring their actions several, and therefore it is good discretion in the court to deny the prohibition." This decision, founded upon compassion and laches, does not seem to have been readily acquiesced in, for in Woodward v. Bonithan, T. Raym. 3, the court held, that mariners' wages were not sueable, in the admiralty. Soon after this the courts sustained the jurisdiction in various cases, although constantly contested (Anon., 1 Vent. 146, 343; Alleson v. Marsh, 2 Vent. 181; King v. Pike, 2 Keb. 779); and from that period, this "sufferance," as Keeling, C. J. (Smith v. Tilly, 1 Keb. 712), calls it, became general, and gradually ripened into a right, which has ever since, in cases of ordinary hire, remained undisputed.

The grounds, upon which this exception has been supported, remain to be considered; and the different reasons, which have been assigned by different judges, may be arranged under the following heads:—1. That it is more convenient for seamen to sue in the admiralty, because they may all join in one suit. Anon., 1 Vent. 146; Wells v. Osmond, 6 Mod. 238, 2 Ld. Raym. 1044; Clay v. Sudgrave, 1 Salk. 33, 1 Ld. Raym. 576; 12 Mod. 405; Howe v. Nappier, 4 Burrows, 1944; Ross v. Walker, 2 Wils. 264; Anon., 8 Mod. 279; Mills v. Gregory, Sayer, 127. 2. That by the maritime law, if the ship perish by the mariners' default, they are to lose their wages; which (it should seem from this reason) would be otherwise due at common law. Anon., 1 Vent. 146. 3. That the true reason is, that though the contract be made on land, yet the ship is made liable for the wages. Wells v. Osmond, 6 Mod. 238, 11 Mod. 31, 2 Ld. Raym. 1044; Clay v. Sudgrave, 1 Salk. 33; Hook v. Moreton, 1 Ld. Raym. 397; Ross v. Walker, 2 Wils. 264. 4. That mariners' wages grow due to them for labor or service done at sea, and the charter and contract at land is only to ascertain their rate. Coke v. Cretchet, 3 Lev. 60; Howe v. Nappier, 4 Burrows, 1944. 5. That it is not on account of the service done at sea, but because they are mariners, and the suit is for mariners' wages: and therefore, if the service be done in port, and the voyage be abandoned, the mariners may still sue for their wages in the admiralty. Wells v. Osmond, 6 Mod. 238, 11 Mod. 31, 2 Ld. Raym. 1044; S. P., Anon., 1 Vent. 343; Mills v. Gregory, Sayer, 127. That the jurisdiction of the admiralty over mariners' wages is an ancient concurrent jurisdiction, as ancient as the constitution itself. Brown v. Benn, 2 Ld. Raym. 1247; S. P., Queen v. London, 6 Mod. 205. 7. That it is expressly against the statutes of Richard II.; and is a mere indulgence, and is now grounded upon the maxim "quod communis error facit jus" (Clay v. Snelgrave, 1 Ld. Raym. 576, 1 Salk. 33; 12 Mod. 406), and nothing but constant practice affirms it (Opy v. Adison, Id. 38; 1 Salk. 31; Day v. Searl, Cunn. 32; 7 Mod. 206); and it is not de jure, but by indulgence (Ewer v. Jones, 2 Ld. Raym. 934; Day v. Searl, Cunn. 32; 7 Mod. 206; Ridg. 53; 2 Barnard, 419).

A short review of these reasons may not be without use. As to the first, it cannot of itself furnish any solid ground for vesting a jurisdiction otherwise unauthorized. It is an argument merely ab inconvenienti; and, besides, the jurisdiction exists equally, whether one or many mariners sue. Alleson v. Marsh, 2 Vent. 181; Hook v. Moreton, 1 Ld. Raym. 397. The second is founded upon a supposition, that the common law would, in the given case, decide differently from the maritime law, which is not true. The third is not universally true, or rather does not universally apply, for a suit may be maintained for mariners' wages in the admiralty, as well in personam, as in rem. It is an entire mistake, that its jurisdiction is in general limited to proceedings in rem. Alleson v. Marsh, 2 Vent. 181. The fourth is in direct hostility to the construction of the common law, as to all other maritime contracts, and if correct, furnishes a complete recognition of the general doctrine of the admiralty. See Abb. Shipp. p. 4, c. 4, § 1. The fifth is a virtual contradiction of the fourth, and puts the jurisdiction upon the personal privilege of the parties, not upon the nature or the place of the service done, a distinction at war with the statutes of Richard, and not easily reconcilable with the case of Ross v. Walker, 2 Wils. 264. The sixth reason is undoubtedly well founded, and is a complete answer to the laborious commentaries of Lord Coke. But the reason is in itself of no weight, unless it is admitted, that the statutes of Richard II. were not intended to abridge any part of the original rightful jurisdiction of the admiralty, but only to check its usurpations over contracts made at land unconnected with maritime business. In this view it has a most important bearing. The seventh and last reason is indeed extraordinary. It may be truly observed, in the pointed language of Mr. Douglas (Wilkins v. Carmichael, 1 Doug. p. 101, note 1), "surely it is not consonant to legal principle to hold, that any usage or common error can abrogate a statute to any purpose, or give legality to what an act of parliament expressly prohibits." It may be added, that all these reasons, except the fourth and sixth, have not the slightest connection with any possible construction of the statutes of Richard II.; and the fourth and sixth, if they are correct in principle, sustain the whole superstructure of the admiralty jurisdiction over all maritime contracts.

In respect also to mariners' contracts, certain distinctions seem to prevail at common law, which are as purely arbitrary and irreconcilable with sound principle, and the statutes of Richard II., as any, which have been mentioned. I allude to the distinctions, that although mariners may sue in the admiralty for their wages for services wholly rendered in port, or in navigating from port to port

within the realm (Wells v. Osman, 2 Ld. Raym. 1044; 6 Mod. 238; Mills v. Gregory, Sayer, 127; Anon., 1 Vent. 343; 2 Brown, Adm. Append. 533), and this, as well where the contract is in writing as by parol, provided it be upon the usual terms and stipulations (Benns v. Parre, 2 Ld. Raym. 1206; Anon., 8 Mod. 379); yet the master of the ship is not allowed, under any circumstances, to sue there for his wages (Ragg v. King, 2 Strange. 858; Clay v. Sudgrave, 1 Salk. 33; 1 Ld. Raym. 576; 12 Mod. 405; Read v. Chapman. 2 Strange. 937; The Favourite, 2 C. Rob. Adm. 232; Bayly v. Grant, 1 Salk. 33, 1 Ld. Raym. 632; 12 Mod. 440), nor the mariners, if their contract be under seal (Palmer v. Pope. Hob. 79, 212; Opy v. Child, 1 Salk. 31; 12 Mod. 38; Day v. Searle. 2 Strange, 968; 7 Mod. 206; Cunn. 32; Ridg. 53; Howe v. Nappier, 4 Burrows, 1944), or contain any unusual covenants or stipulations. The reason of the distinction as to the master is said to be, that the mariners are presumed to contract upon the credit of the ship, and the master upon the personal credit of owner; a reason altogether gratuitous, for the credit is in fact as much given to the owner in the one case as in the other. And Mr. Abbott justly observes, that "it is difficult to distinguish the case of the master from that of the persons under his command; the nature and place of the service, and the place of the hiring, are in both cases usually the same." Abb. Ship. pt. 4, c. 4, § 1. And there have been cases, even at the common law, where the distinction has been doubted and denied. See cases cited in Clay v. Snelgrave, 1 Ld. Raym. 578; 12 Mod. 405; King v. Pike, 2 Keb. 779; Smith v. Tilly, 1 Keb. 712; Barber v. Wharton, 2 Ld. Raym. 1452; 16 Vin. Abr. 438, pl. 35; 2 Brown, Adm. 89, 95, 104.

The next distinction, as to the contract's being under seal, is no where very fully explained. In Bridgeman's Case, Hob. 11, it is said to be, because an obligation takes its course and binds according to the common law, which would seem to be no reason at all. A more plausible reason is, that the civil law requires two witnesses to prove a sealed instrument,[39] whereas the common law requires but one. See Howe v. Nappier, 4 Burrows, 1944; Menetone v. Gibbons, 3 Term R. 267; Smart v. Wolff, Id. 323; and Buller, J., Id. 348. Assuming this statement to be correct, as to the admiralty practice, it ought not to oust the jurisdiction, but to induce the courts of common law, by proper process, to compel a conformity with their own rules. Richardson v. Disborow, 1 Vent. 291; 2 Poth.

---

[39] The civil law never requires two witnesses, nor indeed any witness. unless the execution of the deed is denied by the party on oath, which very rarely can happen. In this respect it holds the chancery rule, that if any fact be denied in the defendant's answer on oath, his denial shall prevail, unless disproved by two witnesses, or one witness, and very strong corroborative circumstances.

Obl. 273, etc., translated by Evans. Besides, the libel is for the service at sea, and the sealed contract comes in collaterally, or in the defence; and if the admiralty have jurisdiction over the subject matter, it has also jurisdiction of all the incidents; and, in such case, though a question arise proper for the common law, yet we are told the admiralty may try it. Tremoulin v. Sands, Comb. 462, 12 Mod. 144; Menetone v. Gibbons, 3 Term R. 267. Another reason has been adduced, viz. that the admiralty is not a court of record, and therefore, like the county court, it cannot hold plea of a specialty. Menetone v. Gibbons, 3 Term. R. 268; 4 Inst. 135. It is not to our present purpose to inquire, how far this is true as to the county court; and if true, what is the foundation of the exception; but in respect to the admiralty, notwithstanding the very positive assertions of Lord Coke, it is by no means admitted, that it is not a court of record. The common law definition of a court of record is, a court that hath authority to fine and imprison. Salk. 200; 12 Mod. 388; 1 Ld. Raym. 213; 3 Bl. Comm. 24; Bac. Abr. "Courts," D 2, p. 101. And accordingly, in Empringham's Case, 12 Coke, 84, it was held, that the admiralty had no power to fine and imprison, because it was not a court of record, and its proceedings were according to the course of the civil law. 4 Inst. 135. The same doctrine had been previously held in Thomlinson's Case, 12 Coke, 104. and in an anonymous case (13 Coke, 52), and yet it was said in the last case, that by custom the admiralty might amerce the defendant for his default at its discretion (19 Hen. VI. p. 7; Brown, Abr. "Admiraltie," 1). But surely this doctrine cannot be true; for it is perfectly clear, that the admiralty from the highest antiquity, has exercised a very extensive criminal jurisdiction, and punished offences by fine and imprisonment. The celebrated inquisition at Queensborough, in the reign of Edward III., would alone be decisive. See, also, Com. Dig. Adm. D 1, 2, E 12, 13. And even at common law it has been adjudged, that the admiralty might fine for a contempt. Anon., Styles, 171; Sparks v. Martyn, 1 Vent. 1; Clerke, Prax. tit. 67; 2 Brown, Adm. 110. As to the other reason for its not being a court of record, viz. that it proceeds according to the course of the civil law, and that an appeal, and not a writ of error, lies from its decrees; they have nothing to do with the question, for whether a court of record or not does not depend upon the form of proceeding in any court. Besides, the admiralty is expressly recognised as a court of record in King Edward's ordinance at Grimsby, where it is said, "La cause estoit pour ce que l'admiral et ses lieutenants sont de record" (Exton, 27); and, in the articles in the Black Book of the Admiralty, it is articulately declared, "Quod admirallus et locum tenentes sui sunt de recordo" (Clerke, Prax. 146; Rough. art. 39). But even admitting, that the admiralty were not a court of record, it would

not show that it had no jurisdiction over sealed contracts; for the chancery is not a court of record, and yet it may clearly entertain suits on them.[40] And, to apply a strong remark of Lord Kenyon (Menetone v. Gibbons, 3 Term R. 267), if the admiralty has jurisdiction over the subject matter, to say that it is necessary for the parties to go upon the sea to execute the instrument (and, as I would add, to make an unsealed contract) borders upon absurdity. Nor are the authorities uniform on this point. In Coke v. Cretchet, 3 Lev. 60; Clay v. Sudgrave, 12 Mod. 406; Buck v. Atwood, 2 Strange, 761; and Gawne v. Grandee, Holt, pp. 49, 50, pl. 6,—it was in effect held, that there was no difference between the contract's being by deed or by parol.

The other distinction, as to the contract containing unusual covenants and stipulations, is quite as unsatisfactory. It is said in its support, that if the contract for service be made upon terms and conditions differing from the general rules of law, the service alone cannot entitle a mariner to his wages; his right then must depend upon the performance of the stipulated terms; and the construction of the instrument containing those terms is a proper subject for the jurisdiction of the courts of common law. Abb. Shipp. pt. 4, c. 4, § 3. The construction of a written instrument is a proper subject for every court having cognizance of the subject matter; and this rule is equally as applicable to the admiralty, as to any other court. The admiralty certainly has cognizance of written contracts in many cases, as of bottomry, and ransoms; and it was never yet heard of, that it had no right to put an interpretation upon these instruments. Even in relation to written contracts for mariners' wages, its jurisdiction is not contested; and if wages are to be decreed, or denied, it is impossible for the court to do either, with justice, unless it looks into and construes the contract. And it would be worse than idleness to contend, that the rules of construction are different in sealed and unsealed instruments. The other ground is more specious, but not more solid. It is not true, in any case, that the wages are due merely because the service is performed. It must be performed according to the express stipulations of the parties, even in the usual form of the contract, or according to the implied stipulations resulting from the maritime law, where that is silent, otherwise the wages will not grow due. And there is no more reason, why courts of common law should have the exclusive construction of written agreements of an unusual sort, than of those upon the ordinary terms. Do these courts vainly imagine that the admiralty cannot construe maritime contracts with as much equity, sound principle, and good sense, as

themselves? It is some pleasure to find, that the soundness of this distinction has, at least in one case, been denied. Benns v. Parre, 2 Ld. Raym. 1206.

All these distinctions are entirely aside from any construction of the statutes of Richard; and if they are to be held as law, they are limitations of judicial discretion in granting "indulgences," which seem nearly allied to the maxim, "Sic volo, sic jubeo, stet pro ratione voluntas." See 2 Brown, Adm. 94, 96, 104.

It has been further asserted, that the admiralty has jurisdiction, only when the parties have bound themselves in rem; for, if they have bound themselves personally, its jurisdiction is said to be ousted. Per Buller, J., in Menetone v. Gibbons, 3 Term R. 267, 270. And see Ouston v. Hebden, 1 Wils. 101. This doctrine is not pretended to be founded upon the statutes of Richard. Yet it is difficult to perceive, how it can be otherwise supported; and no adjudged case rests singly upon it. Indeed, in the very case in which it was alluded to (viz. a maritime hypothecation), the usual form of the instrument includes a personal obligation or covenant. All the forms, which have fallen under my notice, are of this nature, and the customary instrument, a bond, necessarily includes a personal liability. See the forms on Abb. Shipp. Append. Nos. 1–3; Glover v. Black, 3 Burrows, 1394; Marsh. Ins. bk. 2, c. 1, p. 733, etc., and Append. No. 5; 1 Magens, Ins. 25; Molley, De Jur. Mar. bk. 2, c. 11, § 12; 2 Magens, 393; 3 C. Rob. Adm. 31. Yet it is conceded on all sides, that of maritime hypothecations the admiralty has jurisdiction. The case of mariners' wages also involves a personal contract, and nothing is more common, than a libel against the master or owner in personam. In respect also to personal torts on the high seas, such as assaults and batteries, the process is necessarily in personam (2 Brown, Adm. 106, 110, 396, 397), and the same process is familiarly applied in matters of prize (Smart v. Wolff, 3 Term R. 323). So far indeed is it from being true, that the admiralty has no right to proceed except in rem, that in former times, and down to the reign of James I., its proceedings were almost altogether in personam, as they must still be, when the process in rem becomes inapplicable or inefficient. See Spark v. Stafford, Hard. 183; Clerke, Prax. passim; 2 Brown, Adm. 396, 397. The dictum, which we are now considering, seems indeed to have no better or higher origin, than that of a mere inference from the position, that where the common law has jurisdiction, the admiralty is excluded.

We have now finished our review of the doctrines, which the courts of common law have held in the interpretation of the statutes of Richard II. It has been shown, that the decisions are not reconcilable with each other, or with the words of the statute, or with any sound and uniform principle of

---

[40] In the United States courts, there could be no ground for this argument, since all those courts are courts of record.

construction. There seems indeed some foundation for the declaration of Lord Holt (Hoop v. Mareton, 1 Ld. Raym. 397), that "heretofore the common law was too severe against the admiralty;" and for the severe censure of the learned Dr. Browne, that these decisions were founded "more in prejudice than in reason" (2 Brown. Adm. 85); that they were "not founded in any system, nor fraught with any consistency;" and that they have "involved the subject in endless perplexity" (Id. 100).

In addition to the considerations, which have already been submitted, against the common law interpretation of these statutes, there are no small difficulties, which still remain behind. Whole classes of cases are yet within the acknowledged cognizance of the admiralty, which are at war with that interpretation, and can be sustained only upon the more liberal and consistent doctrines of the admiralty. I have already stated the cases of the execution of foreign sentences, and of foreign maritime hypothecations. These are not alone. Until a comparatively modern period, notwithstanding the statutes, the admiralty exercised undisturbed jurisdiction over petitory or proprietory suits (The Aurora, 3 C. Rob. Adm. 136; 2 Brown, Adm. 114, etc.; Clerke, Prax. tit. 42, 41); and it still continues, with the approbation of the common law, to entertain suits, 1. For possession of ships. 2. Upon controversies among part owners as to the employment of ships, and 3dly, Stipulations made on land in causes pending in the court. This last class may properly be deemed a mere incident to the cognizance of the principal cause; yet the common lawyers resisted it, as an infringement of the statutes, and it was not finally established in favor of the admiralty, until after a struggle for a century. 4 Inst. 135; Zouch, 125; Par v. Evans, T. Raym. 78; Degrave v. Hedges, 2 Ld. Raym. 1285; Justice v. Brown, Hard. 473. But, as to the four remaining classes, the admiralty has had jurisdiction from the highest antiquity; and yet these are not "things done upon the sea." It is therefore a necessary inference, either that the common law interpretation is too narrow, and ought to be rejected; or that these authorities, still allowed to be exercised, are gross usurpations. That the latter construction is correct will not be affirmed by any person, who has examined the subject with due diligence and candor. That the former is dictated by general reasoning, public convenience, and great weight of authority, will scarcely be denied. Nay even the prize jurisdiction imperiously demands a similar doctrine, at least so far as it is exercised over prizes captured in rivers, creeks or ports, accessible to the sea; and on land by naval forces. Lindo v. Rodney, Doug. 613, note. See Hubbard v. Pearse, cited in Le Caux v. Eden, Doug. 594, 606, note. For whether, as seems the better opinion (Rob. Coll. Marit. preface VII.) the prize jurisdiction be an immemorial and inherent attribute of the admiralty, or depend upon the commissions issued from time to time during wars, the words of the statutes of Richard as much apply to the prize as to the instance court. And if the prize commission be evidence, that, notwithstanding the statutes, the court may take cognizance of captures in creeks and ports, the ordinary commission of the admiralty is just as good evidence of the extent of its ordinary jurisdiction in the same places.[41] It would seem to be a mistake of Lord Mansfield (Lindo v. Rodney, Doug. p. 613, note 1) that the courts of common law never considered prize causes within the statutes, and that no complaint ever was made respecting them. There are various cases in the books, which intimate a contrary doctrine (Willets v. Newport, 1 Rolle, 250; Weston's Case, 2 Brownl. 11; Thermolin v. Sands, Carth. 423; Anon., March. 110; Anon., 12 Mod. 16; Shermonlin v. Sands, 1 Ld. Raym. 271; Anon., 1 Vent. 308), if the very elaborate judgment of his lordship, to prove the exclusive jurisdiction in matters of prize, were not of itself a strong proof, that nothing was before that time well settled on the subject. Indeed an examination of the various doctrines, found in our common law reports, would not only confirm this statement, but would exhibit many strange and curious deviations from what would at the present day be deemed common place learning in matters of prize. And it is very doubtful, whether, until a recent period, any such distinction, as a prize and instance side of the court, was known among the common lawyers. After some research, I have not been able to detect the slightest allusion to it in any report before the case of Lindo v. Rodney, Doug. 613, note.

Considerations and consequences, like those, which have been mentioned, cannot but forcibly impress every one, who has examined this subject with accuracy and diligence, and lead to the conclusion (adopted by Dr. Brown) that the jurisdiction of the admiralty depends, or ought to depend, as to contracts, upon the subject matter, i. e. whether maritime or not; and as to torts, upon locality, i. e. whether done upon the high sea, or in ports within the ebb and flow of the tide, or not. 2 Brown, Adm. 88, 90, 110. Such is the limit of its jurisdiction, which the admiralty has strenuously asserted at all times, notwithstanding a torrent of prohibitions has compelled it to yield its rights to superior authority. Even in our own times, it has vindicated some of its ancient claims (Velthasen v. Ormsley, 3 Term R. 315; Smart v. Wolffe, Id. 323;

---

[41] In recent statutes, the prize jurisdiction is expressly given in ports and creeks; but the same jurisdiction was exercised by the admiralty before any statutes were made to this effect, as a part of its original powers. See Nabob of the Carnatic v. East India Co., 1 Ves. Jr. 371, 391.

Menetone v. Gibbons, Id. 267; Ladbrooke v. Crickett, 2 Term R. 649); and Dr. Brown has pointedly observed, "If a party should institute a suit in that court on a charter party, for freight, in a cause of average and contribution, or to decide the property of a ship, and be not prohibited, I do not see how the court could refuse to entertain them; and I have some reason to think, that tnis my opinion is supported by very high authority." Sir Leoline Jenkins has also ably pointed out the inconveniences to the public and to trade, if the admiralty jurisdiction be evaded in four of the great branches of maritime contracts. 1. As to foreign contracts, or those made abroad. 2. As to mariners' wages, freight and charter parties. 3. As to building and victualling ships, and as to material men, i. e. those, who furnish materials or supply work for ships. And 4. As to disputes between part owners.[42] Nor should it be forgotten, that in the agreement of the twelve judges in 1632, these claims of the admiralty were most amply admitted and confirmed.[43]

On the whole, the result of this examination may be summed up in the following propositions. 1. That the jurisdiction of the admiralty, until the statutes of Richard II., extended to all maritime contracts, whether executed at home or abroad, and to all torts, injuries, and offences, on the high seas, and in ports, and havens, as far as the ebb and flow of the tide. 2. That the common law interpretation of these statutes abridges this jurisdiction to things wholly and exclusively done upon the sea. 3. That this interpretation is indefensible, upon principle, and the decisions founded upon it are inconsistent and contradictory. 4. That the interpretation of the same statutes by the admiralty does not abridge any of its ancient jurisdiction, but leaves to it cognizance of all maritime contracts, and all torts, injuries and offences, upon the high sea, and in ports as far as the tide ebbs and flows. 5. That this is the true limit, which upon principle would seem to belong to the admiralty; that it is consistent with the language and intent of the statutes; and is supported by analogous reasoning, and public convenience, and a very considerable weight

[42] 2 Brown, Adm. 77, note 5. I have to regret, that I have not been able to consult the originals of two works quoted in this opinion, which would probably have materially aided my inquiries by their learning and ability. I allude to Sir Leoline Jenkins' works, and Prynne's Animadversions on the 4th Institute. These works were not to my knowledge in New England at the time of delivering this opinion; and I have been always obliged to cite them at second hand.

[43] See Wood, Inst. 494. It is apparent, that the late learned Mr. Justice Winchester adopted these claims in their full extent. I know not any man in the United States, who seems to have had more profound and accurate views of the admiralty jurisdiction, than this very able judge. Stevens v. The Sandwich [Case No. 13,409].

of authority. 6. That under all the circumstances, the courts of law and of admiralty in England are not so tied down by a uniformity of decisions, that they are not at liberty to entertain the question anew, and to settle the doctrines upon their true principles; and that this opinion is supported by some of the best elementary writers in that kingdom.

But whatever may in England be the binding authority of the common law decisions upon this subject, in the United States we are at liberty to re-examine the doctrines and to construe the jurisdiction of the admiralty upon enlarged and liberal principles. The constitution has delegated to the judicial power of the United States cognizance "of all cases of admiralty and maritime jurisdiction;" and the act of congress (Sept. 24, 1789, c. 20, § 9) has given to the district court "cognizance of all civil causes of admiralty and maritime jurisdiction, including all seizures under laws of impost, navigation or trade, of the United States, where the seizures are made on waters navigable from the sea by vessels of ten or more tons burthen; within their respective districts, as well as upon the high seas."

What is the true interpretation of the clause "all cases of admiralty and maritime jurisdiction?" If we examine the etymology, or received use, of the words "admiralty" and "maritime jurisdiction," we shall find, that they include jurisdiction of all things done upon and relating to the sea, or, in other words, all transactions and proceedings relative to commerce and navigation, and to damages or injuries upon the sea. Cowell, Interpreter. voce "Admiral;" Spel. Gloss. voce "Admiral," sub finem; Godolph. Jur. c. 1; 1 Valin, Comm. 1; Seld. De Dom. Mar. lib. 2, c. 16, p. 160; Stypman, Jus. Marit. par. 1, c. 6, pp. 76, 77; Id. par. 5, c. 1, p. 602; Loccenius, Jus. Marit. lib. 2, c. 2. In all the great maritime nations of Europe, the terms "admiralty jurisdiction" are uniformly applied to the courts exercising jurisdiction over maritime contracts and concerns. We shall find the terms just as familiarly known among the jurists of Scotland, France, Holland and Spain, as of England, and applied to their own courts, possessing substantially the same jurisdiction, as the English admiralty in the reign of Edward the Third.[44] If we pass from the

[44] Cleirac, Jurisd. de la Marine, p. 191, etc.; Valin, Comm. 1, 112, 120, 127, etc.; Zouch, 87, 91; Exton, 45, 46, 49; collection of sea laws in Malyne, Lex Merc. 47; 2 Brown, Adm. 30. The coincidence between the general authorities delegated in the admiral's commission in Scotland, and still exercised there, and those in the commission of the admiral in England, is so striking as distinctly to show a common origin. The admiralty in Scotland has cognizance of "all complaints, contracts, offenses, pleas, exchanges, assecurations, debts, counts, charter parties, covenants, and all other writings concerning lading and unlading of ships, freights, hires, money lent upon casualties and

etymology and use of these terms (l. e. "admiralty jurisdiction") in foreign countries, the only expositions of them, that seem to present themselves, are, that they refer, 1. To the jurisdiction of the admiralty as acknowledged in England at the American Revolution; or, 2. At the emigration of our ancestors; or 3. As acknowledged and exercised in the United States at the American Revolution; or, 4. To the ancient and original jurisdiction, inherent in the admiralty of England by virtue of its general organization.

As to the first exposition, it is difficult to perceive upon what ground it can be reasonably maintained, for it would enlarge and limit the jurisdiction by the provisions of statutes, which have been enacted for the government and regulation of the high court of admiralty, and which proprio vigore do not extend to the colonies. It would further involve qualifications of the jurisdiction, which are perfectly arbitrary in themselves, inapplicable to our situation, and contradictory to the commissions and practice of the vice admiralty colonial courts. Even if this exposition were to be adopted, are we to be governed by the doctrines of the common law, or of the admiralty? I am not aware of any superior sanctity in the decisions at common law upon the subject of the jurisdiction of other courts (to which at least they bore no good will), which should entitle them to outweigh the very able and learned decisions of the great civilians of the admiralty. And where could we so properly search for information on this subject, as in the works of those jurists, who have adorned the maritime courts from age to age, and made its jurisdiction the pride and study of their lives?

The second exposition is liable to the same objections; for it is clear, that the statutes of Richard do not extend in terms to the colonies, and it is quite certain, that they were not included in any supposed mischiefs, for they then had no existence. Besides, it is a very material consideration, that, at the emigration of our ancestors, the contest between the courts of common law and the admiralty was at its height; and very soon after (in 1632) it was, by the agreement of the twelve judges, decided in favor of the admiralty. And here again it may be asked, whose doctrines are to be adopted, those of the common law or of the admiralty?

The third exposition requires an examination of the authority and powers of the vice admiralty courts in the United States under

the colonial government. In some of the states, and probably in all, the crown established, or reserved to itself the right to establish, admiralty courts; [45] and the nature and the extent of their jurisdictions depended upon the commission of the crown, and upon acts of Parliament conferring additional authorities. The commissions of the crown gave the courts, which were established, a most ample jurisdiction over all maritime contracts, and over torts and injuries, as well in ports as upon the high seas. [46] And acts of parliament enlarged, or rather recognised, this jurisdiction by giving or confirming cognizance of all seizures for contraventions of the revenue laws. The Fabius, 2 C. Rob. Adm. 245. Tested, therefore, by this exposition, the admiralty jurisdiction of the United States would be as large, as its most strenuous advocates ever contended for.

The clause however of the constitution not only confers admiralty jurisdiction, but the word "maritime" is superadded, seemingly ex industria, to remove every latent doubt. "Cases of maritime jurisdiction" must include all maritime contracts, torts and injuries, which are in the understanding of the common law, as well as of the admiralty, "causae civiles et maritimae." In this view there is a peculiar propriety in the incorporation of the term "maritime" into the con-

---

[45] In the charter of Massachusetts, in 1692, there is an express reservation of the exclusive right in the crown to establish admiralty courts, by virtue of commissions issued for this purpose. See, also, Colon. Acts 1668, 1672; Mass. Col. & Prov. Laws (Ed. 1814) p. 716.

[46] It is presumed that the commissions were usually in the same form. One of the latest is to the governor of the royal province of New Hampshire in 6 Geo. III. Stoke's Hist. of Colonies contains (chapter 4, p. 166) a like admiralty commission in the same words. He says this was the usual form. It authorizes the government or "to take cognizance of, and proceed in, all causes civil and maritime, and in complaints, contracts, offences or suspected offences, crimes, pleas, debts, exchanges, accounts, charter parties, agreements, suits, trespasses, inquiries, extortions, and demands, and business civil and maritime whatsoever, commenced or to be commenced between merchants, or between owners and proprietors of ships and other vessels, and merchants or others whomsoever with such owners and proprietors of ships and all other vessels whatsoever employed or used within the maritime jurisdiction of our vice admiralty of our said province, &c. or between any other persons whomsoever had, made, begun or contracted, for any matter, thing, cause or business whatsoever done, or to be done, within our maritime jurisdiction aforesaid, &c. &c.; and moreover in all and singular complaints, contracts, agreements, causes and businesses, civil and maritime, to be performed beyond the sea or contracted there, however arising or happening," with many other general powers. And it declares the jurisdiction to extend "throughout all and every the seashores, public streams, ports, fresh waters, rivers, creeks and arms, as well of the sea, as of the rivers and coasts whatsoever of our said province," &c. In point of fact the vice admiralty court of Massachusetts, before the Revolution, exercised a jurisdiction far more extensive, than that of the admiralty in England. See, also, The Little Joe, Stew. Vice Adm. 394.

---

hazard at sea, and all other businesses whatsoever among sea-farers done at sea, this side sea, or beyond sea; the cognization of writs of appeal from other judges, and the causes and actions of reprisal and letters of mark; and to take stipulations, cognoscions and insinuations in the books of the admiralty." Collect. Sea Laws, c. 2, Malyne, 47. See, also, 1 Bl. Comm. 94, 95; post, p. 444, note 47.

stitution. The disputes and discussions, respecting what the admiralty jurisdiction was, could not but be well known to the framers of that instrument. Montgomery v. Henry, 1 Dall. [1 U. S.] 149; Talbot v. Commanders and Owners of Three Brigs, Id. 95. One party sought to limit it by locality; another by the subject matter. It was wise, therefore, to dissipate all question by giving cognizance of all "cases of maritime jurisdiction," or, what is precisely equivalent, of all maritime cases. Upon any other construction, the word "maritime" would be mere tautology; but in this sense it has a peculiar and appropriate force. And Mr. Justice Winchester (speaking with reference to contracts) has very correctly observed, that "neither the judicial act nor the constitution, which it follows, limit the admiralty jurisdiction of the district court in any respect to place. It is bounded only by the nature of the cause, over which it is to decide." Stevens v. The Sandwich [Case No. 13,409]. The language of the constitution will therefore warrant the most liberal interpretation; and it may not be unfit to hold, that it had reference to that maritime jurisdiction, which commercial convenience, public policy, and national rights, have contributed to establish, with slight local differences, over all Europe; that jurisdiction, which, under the name of consular courts, first established itself upon the shores of the Mediterranean, and, from the general equity and simplicity of its proceedings, soon commended itself to all the maritime states; that jurisdiction, in short, which, collecting the wisdom of the civil law, and combining it with the customs and usages of the sea, produced the venerable Consolato del Mare, and still continues in its decisions to regulate the commerce, the intercourse, and the warfare of mankind. Zouch, c. 1, p. 87, etc.; Seld. ad Fletam, c. 8, § 5; Rob. Collect. Marit. 105, note; Le Guidon, c. 3; 1 Emer. 21. Of this great system of maritime law it may be truly said, "Non erit alia lex Romae, alia Athenis, alia nunc, alia posthac; sed et omnes gentes, et omni tempore, una lex, et sempiterna et immortalis, continebit." Cic. Frag. de Repub. lib. 3 (Editio Bost. 1817, tom. 17, p. 186).

At all events, there is no solid reason for construing the terms of the constitution in a narrow and limited sense, or for ingrafting upon them the restrictions of English statutes, or decisions at common law founded on those statutes, which were sometimes dictated by jealousy, and sometimes by misapprehension, which are often contradictory, and rarely supported by any consistent principle. The advantages resulting to the commerce and navigation of the United States, from a uniformity of rules and decisions in all maritime questions, authorize us to believe that national policy, as well as juridical logic, require the clause of the constitution to be so construed, as to embrace all maritime contracts, torts and injuries, or, in other words, to embrace all those causes, which originally and inherently belonged to the admiralty, before any statutable restriction. And most cordially do I subscribe to the opinion of the learned Mr. Justice Winchester, in the case already cited (Stevens v. The Sandwich [Case No. 13,409]), "that the statutes of Richard II. have received in England a construction, which must at all times prohibit their extension to this country," and "that no principles can be extracted from the adjudged cases in England, which will explain or support the admiralty jurisdiction, independent of the statutes or the works of jurists, who have written on the general subject." Indeed the doctrine that would extend the statutes of Richard to the present judicial power of the United States seems little short of an absurdity. It is incorporating into the text of the constitution an exception, not only unauthorized by its terms, but wholly inappropriate in phraseology to any other realm than England. We have not as yet any "admirals or their deputies;" we do not refer their jurisdiction to the reign of "the most noble King Edward the Third;" much less would an American citizen dream, that the constitution authorized the admiralty "to arrest ships in the great flotes for the great voyages of the king and of the realm;" and "to have jurisdiction upon the said flotes during the said voyages only," and "saving always to the king all manner of forfeitures and profits thereof coming," and "to the lords, cities and boroughs their liberties and franchises."

There are moreover decisions of the courts of the United States, which completely establish the proposition, that the statutes of Richard, and the common law construction of them, do not attach to this clause of the constitution. We have already seen, that the courts of common law, after these statutes, held, that the admiralty had no jurisdiction of things done within the ebb and flow of the tide, in ports, creeks, and havens. It has, notwithstanding, been repeatedly and solemnly held by the supreme court, that all seizures under laws of impost, navigation and trade, on waters navigable from the sea by vessels of ten or more tons burthen, as well within ports and districts of the United States, as upon the high seas, are causes of admiralty and maritime jurisdiction. U. S. v. La Vengeance, 3 Dall. [3 U. S.] 297; Same v. The Sally, 2 Cranch [6 U. S.] 406; Same v. The Betsey and Charlotte, 4 Cranch [8 U. S.] 443. This limitation, as to the place of seizure, is prescribed by an act of congress (Act Sept. 24, 1789, c. 20, § 9 [1 Stat. 76]), but it is perfectly clear, that congress have no authority to include cases within the admiralty jurisdiction, which the terms of the constitution did not warrant. And the ground is made stronger by the consideration, that the right

of trial by jury is preserved by the constitution in all suits at common law, where the value in controversy exceeds twenty dollars; and by the statute, this right is excluded in all cases of admiralty and maritime jurisdiction. It is therefore utterly impossible to reconcile these decisions which in my humble judgment are founded in the most accurate and just conceptions of the admiralty jurisdiction, with the narrow and perplexed doctrines of the common law. The argument then, that attempts to engraft them upon the constitution, is wholly untenable.

On the whole, I am, without the slightest hesitation, ready to pronounce, that the delegation of cognizance of "all civil cases of admiralty and maritime jurisdiction" to the courts of the United States comprehends all maritime contracts, torts, and injuries. The latter branch is necessarily bounded by locality; the former extends over all contracts, (wheresoever they may be made or executed, or whatsoever may be the form of the stipulations,) which relate to the navigation, business or commerce of the sea.

The next inquiry is, what are properly to be deemed "maritime contracts." Happily in this particular there is little room for controversy. All civilians and jurists agree, that in this appellation are included, among other things, charter parties, affreightments, marine hypothecations, contracts for maritime service in the building, repairing, supplying, and navigating ships; contracts between part owners of ships; contracts and quasi contracts respecting averages, contributions and jettisons; and, what is more material to our present purpose, policies of insurance. S. P. Johnson, J., in Croudson v. Leonard, 4 Cranch [8 U. S.] 434; Clcirac, Le Guidon, c. 1, p. 109; Id. c. 3, p. 124; Id. Jurisd. de la Marine, p. 191; 1 Valin, Comm. 112, 120, etc., 127, etc.; 2 Emer. 319; Godolph. 43; Zouch, 90, 92; Eaton, 69, etc., 295, etc.; Malyne, Lex Merc., 303; Id., Collection of Sea Laws, c. 2, p. 47; Consol. del Mare, c. 22; 2 Brown, Adm. c. 4, p. 71; 4 Bl. Comm. 67; Stevens v. The Sandwich [supra]; Targa, Reflex. c. 1. And in point of fact the admiralty courts of other foreign countries have exercised jurisdiction over policies of insurance, as maritime contracts; and a similar claim has been uniformly asserted on the part of the admiralty of England. 2 Boucher, Consol. del Mare, p. 730; 1 Valin, Comm. 120; 2 Emer. 319; Roccus de Assec. note 80; 2 Brown, Adm. 80; Zouch, 92, 102; Molloy, bk. 2, c. 7, § 18. There is no more reason why the admiralty should have cognizance of bottomry instruments, as maritime contracts, than of policies of insurance. Both are executed on land, and both intrinsically respect maritime risks, injuries and losses.[47]

My judgment accordingly is, that policies of insurance are within (though not exclusively within) the admiralty and maritime jurisdiction of the United States.[48] I therefore overrule the plea to the jurisdiction, and assign the respondent to answer peremptorily upon the merits.

In making this decree, I am fully aware, that from its novelty it is likely to be put to the question with more than usual zeal; nor can I pretend to conjecture, how far a superior tribunal may deem it fit to entertain the principles, which I have felt it my solemn duty to avow and support. Whatever may be the event of this judgment, I shall console myself with the memorable words of Lord Nottingham, in the great case of the Duke of Norfolk, 3 Ch. Cas. 52: "I have made several decrees, since I have had the honor to sit in this place, which have been reversed in another place; and I was not ashamed to make them, nor sorry when they were reversed by others."

---

DE LOYNE v. DAVIDSON. See Case No. 14,921.

DELPHOS, The (UNION TOW-BOAT CO. v.). See Case No. 14,400.

---

[47] Roccus de Ass., note 80, declares: "These subjects of insurance, and disputes relative to ships, are to be decided according to maritime law; and the usages and custom of the sea are to be respected. The proceedings are to be according to the forms of maritime courts, &c." Targa, in his Reflections (chapter 1), defines maritime contracts to be those, which, according to mercantile usage, respect or concern maritime negotiations and their incidents. It has been already stated that the jurisdiction of the admiralty in England and in Scotland were originally the same. And the admiralty in Scotland still continues to exercise jurisdiction over all maritime contracts, and particularly over policies of insurance, upon the footing of its ancient and inherent rights. In Dow's Reports of decisions in the house of lords in 1813 and 1814, are no less than eight insurance causes, which were originally brought in the admiralty in Scotland, and finally decided on appeals by the house of lords; Lords Ellenborough, Eldon and Erskine, assisting in the decisions; Watt v. Morris, 1 Dow, 32; Tennant v. Henderson, Id. 324; Watson v. Clark, Id. 336; Brown v. Smith, Id. 349; Sibbald v. Hill, 2 Dow, 263; Hall v. Brown, 367; Smith v. Macneil, Id. 538; Smith v. Robertson, Id. 474.

[48] There can be no possible question, that the courts of common law have acquired a concurrent jurisdiction, though, upon the principles of the ancient common law, it is not easy to trace a legitimate origin to it.

